FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

99 NOV 18 AM 10: 02

U.S. DISTRICT COURT
N.D. OF ALABAMA

|  |  |  |
|---|---|---|
| ANTHONY ASH, EDDIE BULLOCK, ROBIN DAVENPORT, JOHN HITHON, TRAVIS TANNER and VIVIAN THORNTON, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CV-96-RRA-3257-M |
| vs. | ) ) ) | |
| TYSON FOODS, INC., | ) ) | ENTERED |
| Defendant. | ) | NOV 1 8 1999 |

## MEMORANDUM OF OPINION

The claims in this case are discrimination or discrimination-related claims. Before the court is the defendant's motion for summary judgment, seeking dismissal of all claims. The case is rather complicated because of the number of plaintiffs, their numerous claims, and voluminous summary judgment evidence. The alleged discrimination took many forms. All of the plaintiffs have more than one claim. Some facts are common to some but not all of the plaintiffs. The parties have submitted exhaustive briefs, wherein the numerous and varied facts are stated and the law is argued. The court also heard oral argument. The plaintiffs have skillfully wrung out of the facts every possible argument favorable to their claims.

62

There are six plaintiffs. Anthony Ash, Eddie Bullock, John Hithon, and Travis Tanner are black males, Vivian Thornton is a black female, and Robin Davenport is a white female. Defendant Tyson is a chicken processing company with headquarters in Springdale, Arkansas. The Gadsden, Alabama plant, the Tyson plant in question, is one of many Tyson facilities. All of the plaintiffs present discrimination claims based upon layoffs or demotions. Ash and Hithon additionally assert that they were denied promotions to shift manager when they became vacant in July and August of 1995, respectively, while Bullock claims that he was denied promotion to waste water superintendent. Thornton also asserts a fraudulent inducement of employment claim. All plaintiffs except Thornton assert retaliation claims.

It is uncontested that Tyson issued a company-wide mandate to reduce the non-labor payroll by 5 percent. The mandate's purposes were to improve the company's performance and increase its profits. The Gadsden plant was especially in need of streamlining, as it was losing approximately $248,000.00 weekly, more than any other Tyson facility. Tyson contends that the lay-offs and demotions resulted from a good faith attempt to improve Gadsden's performance and reduce its costs. The plaintiffs do not contest the need to save money and to make the Gadsden plant more efficient, rather they contest the particular changes made. The plaintiffs contend that the need to improve the Gadsden facility was used as an opportunity to discriminate against black employees.

2

The company hierarchy was as follows, in descending order: plant manager; shift managers (two); superintendents (six before the 1995 demotions, four after); supervisors who were responsible for the hourly workers (thirty-six before lay-offs, thirty-one after); and hourly workers. The actions complained of began shortly after Tom Hatley came to Gadsden as plant manager in June, 1995. When the two shift managers left the company, Hatley named two persons to replace them. Later, the new shift managers were instructed to identify what superintendent positions, if any, could be eliminated. The two managers and Hatley determined that management could be reduced by two production superintendents and six production supervisors.[1] Randy King and Steve Dade recommended to Hatley that Ash and Hithon should be the two superintendents to lose their positions. Then the four remaining superintendents – two black males, one white female, and one black female – along with the two shift managers, were given the task of deciding which supervisors to recommend for lay-off. Before lay-offs, there were thirty-six supervisors in the Gadsden plant, of whom five were laid off, including plaintiffs Bullock, Tanner, Thornton, and Davenport. When Ash and Hithon lost their superintendent positions they were made supervisors, thus, the Gadsden plant had a net loss of three supervisors. Tyson asserts that all four laid off plaintiffs were given certain options,

_____

[1] They also determined that four clerical positions and one nurse's position could be eliminated, and that the number of hours of work for certain remaining clerical positions could be reduced.

3

including jobs as hourly workers.  Bullock, Tanner, Thornton, and Davenport were all later

recalled.

The undisputed gender and racial composition before and after the demotions and

lay-offs is as follows:

|  | Before Demotion | After Demotion |
|---|---|---|
| **SUPERINTENDENT** | | |
| Black Males | 66.6% (4 of 6) | 50% (2 of 4) |
| Black Females | 16.67% (1 of 6) | 25% (1 of 4) |
| White Females | 16.67% (1 of 6) | 25% (1 of 4) |
| **SUPERVISOR** | | |
| Black Male | 13.89% (5 of 36) | 15.15% (5 of 33) |
| White Male | 30.56% (11 of 36) | 30.30% (10 of 33) |
| Black Female | 27.78% (10 of 36) | 27.27% (9 of 33) |
| White Female | 15%   (9 of 36) | 24.24% (8 of 33) |
| Hispanic | 2.77%  (1 of 36) | 3.03% (1 of 33) |

The breakdown according to gender and race only is as follows:

|  | Before Demotion | After Demotion |
|---|---|---|
| **SUPERINTENDENT** | | |
| Males | (4/6) 66% | (2/4) 50% |
| Females | (2/6) 33% | (2/4) 50% |
| Blacks | (5/6) 83% | (3/4) 75% |
| Whites | (1/6) 16% | (1/4) 25% |
| **SUPERVISOR** | | |
| Male | (17/36) 47% | (15/33) 45% |
| Female | (19/36) 53% | (18/33) 55% |
| Blacks | (15/36) 42% | (14/33) 42% |
| Whites | (20/36) 55% | (18/33) 54% |
| Hispanic | (1/36) 3.0% | (1/33) 3.0% |

4

In its motion for summary judgment, Tyson contends that it is due judgment on all of the plaintiffs' claims. Specifically, Tyson contends that none of the plaintiffs has made out a prima facie case of intentional discrimination under Title VII or Section 1981. Tyson further contends that even if a plaintiff has met the prima facie test, Tyson has articulated legitimate, non-discriminatory reasons for its actions and that the plaintiffs have not pointed out evidence sufficient to create a fact question as to whether those reasons are mere pretexts for intentional discrimination. Tyson also discusses other claims set out in the plaintiffs' complaint and amendments thereto.

### "HOUSEKEEPING" MATTERS

Although the defendant states that it "files a global motion for summary judgment on all of plaintiffs' claims," *Plaintiffs' Brief*, p. 3, not all of the plaintiffs' claims are addressed in the defendant's summary judgment argument or its supporting brief. Some claims

discussed by the defendant were not addressed by the plaintiffs in their responsive brief.[2]

In *Road Sprinkler Fitters Local Union # 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994), the court stated the non-moving party's obligation to respond to all issues raised in a summary judgment motion.

> The union alleged in its complaint that Independent II was required to arbitrate because it was formed as "an alter ego of and/or a successor corporation" to Independent I . . . and is bound by the terms and conditions of the [settlement] agreements . . . entered into by Independent I. Independent II, by counterclaim and later in its motion for summary judgment, alleged that it was neither alter ego of nor successor to Independent I. Despite having alleged alter ego status, the union did not raise that issue in its motion for summary judgment or in its proposed conclusions of law submitted in support of its motion. It did not assert alter ego in opposition to Independent II's motion for summary judgment, which alleged that Independent II was not the alter ego of Independent I. The district court therefore declined to address the alter ego status as an issue.
>
> > Although the Complaint alleges that Independent II is either the alter ego of and/or the successor to Independent I, the issue of alter ego status is not raised by the plaintiff in either its motion for summary judgment, or its subsequent [proposed] conclusions of law. Therefore, although the defendants briefed the issue of alter ego status, the Court will not address it in this Order.
>
> The court was correct in its ruling. It could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment.

---

[2] The plaintiffs' brief initially sets out the facts on a plaintiff-by-plaintiff basis. Later in the brief, when the plaintiffs address their various claims, they set out the evidence they contend supports those claims and defeats the defendant's motion for summary judgment. The evidence set out by the plaintiffs in their compartmentalized discussions of their various claims are, in the main, the facts used by the court to analyze those claims. The court should not be expected – it is *not* stated that the parties do expect the court – to search briefs or the entire evidentiary record in order to determine whether there exists evidence other than that set out by the plaintiffs in their discussions of their particular claims. On the other hand, not all of the evidence referenced by the parties is stated in this opinion.

10 F.3d at 1568 (citations and footnote omitted). "A trial judge may properly depend upon counsel to apprise her of the issues for decision. The judge is not obligated to search for other issues that 'may lurk in the pleadings.' " *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986).

Count IX of the amended complaint alleges negligent hiring, retention, training, and supervision. This claim was not addressed by the plaintiffs or the defendant. At oral argument, however, the plaintiffs stated that they were required to respond only to the matters raised in the defendant's summary judgment motion and brief. Tyson did not dispute that statement. However, it is noted that the court has been pointed to no evidence which supports this claim; also, if summary judgment on the underlying claims is granted, the negligence claims must also fail, and in that event there would be no justification for keeping this claim in the case.

The defendant's summary judgment brief *did* address Hithon's claim of constructive termination, as well as the plaintiffs' pattern and practice claim. The plaintiffs, however, discussed neither claim. Therefore, both of these claims are due to be dismissed as abandoned.

The plaintiffs acknowledge that they no longer maintain their First Amendment allegations – Count VI of the original complaint – which were omitted from the

7

superseding second amended complaint. This claim is due to be dismissed as abandoned. *Any claim not identified* in this memorandum opinion is deemed waived.

The plaintiffs have filed a motion to strike the affidavit of Randy Murphy, which discusses the financial losses incurred by the operation of the Gadsden plant, on the ground that Murphy was not working there when the losses he discusses were incurred. It seems, however, that Murphy could look at Gadsden's records and get this information. In any event, it is the court's understanding that the amount of Gadsden's losses is not in dispute. The motion to strike is due to be denied.

## SUMMARY JUDGMENT STANDARD

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P.56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir. 1991). Once that

initial burden has been carried, however, the non-moving party may not merely rest upon

his pleading, but must come forward with evidence supporting each essential element of

his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who

carries the ultimate burden of proving his action, is able to show some evidence with

respect to each element of his claim, all other issues of fact become immaterial and the

moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S.

317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has

explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact, 'since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (citation omitted). "Summary judgment may be

inappropriate even where the parties agree on the basic facts, but disagree about the

inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co.*, 420

F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed

facts, then the court should deny summary judgment. *Impossible Electronic [Techniques, Inc.*

*v. Wackenhut Protective Systems, Inc.*], 669 F.2d [1026] at 1031 [(5th Cir.1982)]; *Croley v.*

*Matson Navigation Co.,* 434 F.2d 73, 75 (5th Cir. 1970)." *Treister v. City of Miami,* 893 F. Supp.

1057, 1059 (S.D. Fla. 1992).

## DISCRIMINATION LAW

### Presumptions, Burden to Come Forward With Evidence

In *Combs v. Plantation Patterns,* 106 F.3d 1519 (11th Cir. 1997), the court explained in

detail the law respecting the employee's duty to establish a prima facie case of

discrimination; if the employee does, the burden of the employer to proffer legitimate, non-

discriminatory reasons for its actions; and the state of the case thereafter. The court stated:

> Under [the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981)] framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine,* 450 U.S. at 253-54 & n. 6, 101 S. Ct. at 1093-94 & n. 6.
>
>> Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence and if the evidence is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.
>
> *Burdine,* 450 U.S. at 254, 101 S. Ct. at 1094 (footnote omitted).
>
> The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, nondiscriminatory reasons for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802; *Burdine,* 450 U.S. at 154. To satisfy that burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 154-55, (citation and footnote omitted). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not* been motivated by discriminatory animus." *Id.* at 257 (emphasis added).
>
> If a defendant carries its burden of producing legitimate, nondiscriminatory reasons for its decision, the presumption of discrimination created by the *McDonnell*

*Douglas* framework "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Burdine,* 450 U.S. at 255 & n. 10. However, elimination of the presumption does "not imply that the trier of fact no.longer may consider evidence previously introduced to establish a prima facie case." *Id.* at 255 n. 10. As the Supreme Court has explained:

> A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.

Once a defendant satisfies its intermediate burden of production, and the initial presumption of discrimination accompanying the prima facie case has been eliminated, the plaintiff has the opportunity to discredit the defendant's proffered explanations for its decision. According to the Supreme Court:

> [The plaintiff] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. . . . [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence.*

*Id.* at 256, 101 S. Ct. at 1095 (emphasis added)(citation omitted). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to include that the reasons given by the employer were not the real reasons for the adverse employment decision. *Id.; McDonnell Douglas,* 411 U.S. at 804, 93 S. Ct. at 1825.

*Combs,* 106 F.3d at 1527-28.[3] Thus, disbelief of the employer's stated reasons for its actions does not *require* judgment for the plaintiff. However, such disbelief, along with the plaintiff's prima facie case, is sufficient to *allow* an inference of discrimination and additional evidence is not required.

---

[3] The defendant's burden to come forward with legitimate, non-discriminatory reasons for its actions is "exceedingly light." *Smith v. Horner,* 839 F.2d at 1537. Where the defendant offers more than one legitimate, non-discriminatory reason for its action, the plaintiff must carry his burden of establishing pretext as to each reason. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1539 (11th Cir. 1997).

The court stated the employee's burden at summary judgment and at trial.

> *The plaintiff may succeed* by directly persuading the court at trial that a discriminatory reason more likely motivated the employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence.* In order to establish pretext, the plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie case.
>
> . . . .
>
> [P]laintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of facts, which when taken in light most favorable to the non-moving party, could allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext.

*Combs,* 106 F.3d at 1530 *(quoting Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 920-21

(11th Cir. 1993)).[4]  The *Combs* court further explained:

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," *Cooper-Hudson v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994) (citation omitted). The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Sheridan,* 100 F.3d at 1072 (citation and internal quotation marks omitted); *see also Walker,* 53 F.3d at 1564 (Johnson, J., concurring) (discussing methods of proving pretext). However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action. At that point, judgment as a matter of law is unavailable.

---

[4] Since *Combs* held that evidence of pretext must be established in order to overcome a motion for *summary judgment,* and since it also held that a factual issue of pretext can be established through *cross-examination,* it might be that the cross-examination the court contemplated was not cross-examination during trial, but depositional cross-examination. *Combs,* 106 F.3d at 1530-31.

*Id.* at 1538.[5]

### Indirect v.  Direct Evidence of Intentional Discrimination

An employee can establish a prima facie case through direct evidence or circumstantial evidence.

> A plaintiff alleging disparate treatment may establish a prima facie case of discrimination in several ways. One such way is to produce credible direct evidence of discriminatory intent. If a plaintiff produces direct evidence, the burden shifts to the defendant to prove by a preponderance of the evidence that the same employment decision would have been reached even absent the discriminatory intent.  *See, e.g., Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir. 1982). In the alternative, a plaintiff may present a prima facie case of discrimination through circumstantial evidence.

*Smith v. Horner,* 839 F.2d 1530, 1536 (11th Cir. 1988) (footnote omitted). "Direct evidence of discrimination is evidence which, if believed, proves the existence of a fact without the necessity of inference or presumption.  It is only the most blatant remarks whose intent could be nothing other than to discriminate, which constitute direct evidence of discrimination." *Earley v. Champion International Corporation,* 907 F.2d 1077, 1081 (11th Cir. 1990).[6] The case at bar is not a direct evidence case.

---

[5] The district judge was reversed in *Combs,* the appellate court holding that the employer's motion for judgment as a matter of law should have been granted.

[6] A statement that a black person is needed in a particular job is direct evidence of discrimination.  *Caban-Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir. 1990).

<u>Prima Facie Case of Intentional Promotion Discrimination</u>

What constitutes a prima facie case of intentional discrimination in a promotion claim?

Under the framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973),

> A plaintiff may establish a prima facie case of promotion discrimination by proving that he or she is a member of a protected minority, was qualified for and applied for the promotion, was rejected despite these qualifications, and that other employees with equal or lesser qualifications who were not members of the protected minority were promoted. *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 n. 7 (11th Cir. 1983).

*Smith v. Horner*, 839 F.2d 1530, 1536 (11th Cir. 1988)(footnote omitted).

<u>Prima Facie Cases in Termination, RIF, and Failure-To-Hire Claims</u>

Case law sets out prima facie tests for claims of disparate treatment in reduction-in-force (RIF), straight termination of employment, and failure-to-hire cases. Deciding which category particular claims fall into is some times unclear.

In *Earley v. Champion International Corp.*, 907 F.2d 1082 (11th Cir. 1990), the plaintiff conceded that his job was eliminated for legitimate business reasons. His only claim was that his employer discriminated against him because of his age when it failed to find him

14

another position in the company.  The court set out the requirements for a prima facie RIF

claim:

> Generally, a plaintiff in a job-reduction case can establish a prima facie case by
> demonstrating (1) that he was in a protected age group and was adversely affected
> by an employment decision; (2) that he was qualified for his current position or to
> assume another position at the time of discharge or demotion; and (3) evidence by
> which a fact finder might reasonably conclude that the employer intended to
> discriminate on the basis of age. Where a particular job position is entirely
> eliminated for nondiscriminatory reasons, for plaintiff to prevail against his
> employer he must show that he was qualified for another available job with that
> employer; qualification for his current position is not enough."

*Early*, 907 F.2d at 1082-83.  The court pointed out that "the essence of a RIF is that

competent employees who in more prosperous times would continue and flourish at a

company may nevertheless have to be fired." *Id.* at 1083 (*quoting Healy v. New York Life

Insurance Co.*, 860 F.2d 1209, 1220 (3d Cir. 1988)).

   *Coutu v. Martin County Board of Commissioners*, 47 F.3d 1068 (11th Cir. 1995) is

another case in which the plaintiff's job was eliminated. Tammy Coutu's position as

Personnel Assistant to the County Administrator was eliminated when, ostensibly due to

budgetary constraints, the duties of her position and the duties of another position were

given to the Assistant County Administrator. When the position of Assistant County

Administrator was awarded to Whittle, another of the defendant's employees, Coutu

applied to the Board for Whittle's old job. The plaintiff's performance as Personnel

Assistant, however, had been criticized, and Whittle's former position was given to another

person. Coutu contended that the Board discriminated against her by terminating her employment and by not rehiring her. The court set out the prima facie requirements of termination of employment, RIF, and failure-to-hire claims. As to a straight termination claim, the court stated:

> In order to prove discriminatory treatment in violation of Title VII, a plaintiff must first establish a prima facie case of discrimination. Absent direct evidence of discrimination, a plaintiff in a termination case establishes a prima facie case by showing (1) that she is a member of a protected class, (2) that she was qualified for the position held, (3) that she was terminated, and (4) that she was replaced by a person outside the protected class.

*Coutu*, 47 F.3d at 1073 (footnote omitted). As to a prima facie RIF claim, the court stated:

> When the plaintiff is terminated through a reduction in force, the prima facie case is modified somewhat, such that the plaintiff must show (1) that she is a member of a protected class, (2) that she was terminated, (3) that she was qualified for another position at the time of termination, and (4) that the employer intended to discriminate in failing to consider the plaintiff for another position.

*Id* . (footnote omitted). In a straight failure-to-hire claim, the court wrote:

> In a case alleging failure to hire, the plaintiff must establish a prima facie case by showing (1) that she is a member of a protected class, (2) that she applied and was qualified for the job, (3) that despite her qualifications, she was rejected, and (4) that the position remained open or was filled by a person outside the protected class."

*Id.* (footnote omitted). The court then made its determinations:

> [W]e express some doubt as to whether Coutu established a prima facie case of national origin discrimination. As to her termination, Coutu failed to prove that she was replaced by someone outside the protected class; indeed, she was not replaced at all, as her position was eliminated. If Coutu's termination is considered a reduction in force, there is some question as to whether Coutu was qualified for another position; the only position she sought was that of Executive Assistant, and her poor working relationship with Oldham may have disqualified her for that

16

position. Nevertheless, we will, as did the district court, assume without finding that Coutu established a prima facie case of national origin discrimination.

*Id.* The court addressed the employer's stated reasons for not re-hiring Coutu, noted her failure to present any pretextual evidence, and applied the familiar law concerning conclusory allegations: where an employer has presented extensive evidence of non-discriminatory reasons for its actions, conclusory allegations are insufficient to raise an inference of pretext. *Id.* at 1073-74.

The RIF prima facie tests set out in *Coutu* and *Earley*, both Eleventh Circuit cases, are in harmony with each other. Both cases state that there must be a showing of discriminatory evidence and both required the employee to show that he was qualified for another job which he did not get or was not considered for. The *Earley* test, however, adds the qualification, "[w]here a particular job position is entirely eliminated for nondiscriminatory reasons."

### Prima Facie Tests In Superintendent And Supervisor Claims Now At Issue

In the plaintiffs' brief, Ash and Hithon state a prima facie RIF test somewhat different from those stated in *Coutu* and *Earley*:

Although Plaintiffs contest the demotion of Mr. Ash and Mr. Hithon was consistent with a company-wide RIF, the elements of a prima facie case of discrimination involving a RIF are: (1) the plaintiff is part of a protected group; (2) he was qualified for the position he held at the time of the demotion; and (3) "evidence by which a factfinder might reasonably conclude that the employer intended to discriminate on the basis of [race] in reaching the decision at issue." *Isenbergh v. Knight-Ridder*

17

*Newspaper Sales, Inc.*, 97 F.3d 436, 439-440 (11th Cir. 1996), *quoting Earley v. Champion International Corp.*, 907 F.2d 1082 (11th Cir. 1990).

*Plaintiff's Brief*, p. 78.

The plaintiff's test, though citing *Earley*, omits the requirement that, if the plaintiff's job is entirely eliminated, the employee must show that he was qualified for another job and did not get or was not considered for it. The plaintiffs stated at oral argument that they had formulated a prima facie test to fit the facts of the instant case. Ash and Hithon contend that the decision to reduce the number of superintendents from six to four was *not a true RIF action*, but an excuse to get rid of two black superintendents, them in particular, by demoting them superintendents to supervisors. Bullock, Tanner, and Thornton also claim that their lay-offs were not bona fide RIF actions, but an attempt to lay-off black supervisors, them in particular, while Davenport asserts that motivating factors in her lay-off was her sex and the fact that she was dating a black man.

The RIF test most closely fits the facts of the instant case. Ash and Hithon describe the loss of their positions as "demotions," which is consistent with the *Earley* prima facie RIF test, which specifically includes "demotions."[7] Ash and Hithon were not terminated,

---

[7]The plaintiffs define "demotion" as a reduction to a lower position though the pay remains the same. *Plaintiffs Brief*, p. 79. Demotion and elimination of position are, in effect, the same for Ash and Hithon.

as they were given jobs as supervisors.[8]  Neither were Bullock, Tanner, Thornton, or Davenport terminated, as they were temporarily laid off, and later recalled.[9]

If the RIF prima facie tests set out in *Coutu* and *Earley* are strictly used, however, none of the demotion and lay-off plaintiffs has established a prima facie case of discrimination, for the plaintiffs were considered for and offered other jobs with Tyson or were later recalled. However, the several tests for establishing prima facie cases of discrimination which are set out in the cases are not to be rigidly applied. Reorganizations or reductions in force can be covers for discriminatory action, and when an employee makes such allegations the court should look behind the employer's claim that the challenged action was simply a good faith business decision. *Montana v. First Federal Savings and Loan Association of Rochester*, 869 F.2d 100, 107 (2nd Cir. 1989). *Earley* pointed out the need for flexibility, stating that in cases based on circumstantial evidence, the

---

[8] Even If Leath took over some of Ash's duties as Ash states in the plaintiffs' brief, there were still only four superintendents. Ash was not replaced by another person who became a superintendent. (Again, neither Ash nor Hithon were terminated, as they were given supervisor jobs.)

[9] It was company policy that if an employee were laid off for more than six months, he or she was automatically terminated. It is noted that the laid off supervisors were supposedly given the following options: jobs as hourly workers at the Gadsden plant; transfer to another location, based on the employee's qualifications; or a severance package. Tolbert, a white male, accepted one of the options, the severance package. However, Tanner and Thornton state that they asked Dade if they could go back to the "line" — that is, jobs as hourly workers — but Dade refused those requests, even though Gadsden was hiring hourly workers at the time. Tanner and Thornton, however, are not claiming discrimination in not getting jobs as hourly workers. Neither are they making termination claims.(Even though it is stated in the plaintiffs' brief that Davenport was *replaced* by a male, which assertion is also discussed later in this opinion, it is deemed that Davenport is not making a termination claim.)

*McDonnell Douglas* test can be "useful," and characterized the test it (Earley) set out as being a "variant" of the *McDonnell Douglas* test. *Earley*, 907 F.2d at 1082. In *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436 (11th Cir. 1996), it was stated that although "case law suggests that the standard for establishing a prima facie case depends on whether the case concerns a reduction in force as opposed to a termination or a failure to hire," the *McDonnell Douglas* test was intended to be flexible and not mechanized or ritualistic, that the Eleventh Circuit had stated various reformulations of it, and that the facts in *Isenbergh* illustrate why prima facie tests must be flexible. *Id.* at 440.[10]

---

[10] In *Isenbergh*, there was a merger of two newspaper companies. At the time of the merger, Isenbergh and Malloy were both managers of their respective companies' sales office in Miami. After merger, the position of one overall manager was created. The district court treated *Isenbergh* as a "failure to hire" case, as opposed to a "reduction in force" case. The unusual facts in *Isenbergh* created a hybrid situation, and the Eleventh Circuit stated:

> In a sense , the position of manager of Newspapers First's Miami office was a new job as a result of the merger of KRNS and MMTM, and Isenbergh's and Malloy's previous positions disappeared. From this viewpoint, the case is one of a failure to hire. Because the candidates considered for this "new" position, however, were all from within the two merging companies, the situation was not the same as in a standard failure-to-hire case. In essence, because of the merger, there was reduction in force from two managers to one. In deciding whether Isenbergh has established a prima facie case, we need not crudely categorize the facts as involving either a failure to hire or a reduction in force. Instead we examine the facts of this case and decide 'whether the plaintiff has presented sufficient evidence to provide a basis for an inference that age was a factor in the employment decision.' *Pace*, 701 F.2d at 1387.
>
> We conclude that Isenbergh presented a prima facie case. Isenbergh was in the protected age group, and he was adversely affected by Newspapers First's decision to select Malloy, who is sixteen years younger than Isenbergh, as the new manager. Moreover, because the decision makers for Newspapers First were familiar with Isenbergh's performance in his work for KRNS, we can infer from the fact that he was granted an interview that Isenbergh was at least at some level qualified for the new job. . . . Here, Newspapers First met its burden of production by asserting that Isenbergh was denied the managerial position because he was the less qualified of two applicants for the same job. . . .

Prima facie tests in non-RIF claims, however, do not include intent to discriminate as an element. In a non-RIF claim, intent to discriminate is the ultimate issue to be decided, and, before a plaintiff is entitled to have his case submitted to the finder of fact, he must present a prima facie case of intentional discrimination. Establishment of a prima facie case of discrimination in a non-RIF claim creates a *presumption* of intentional discrimination. It is this presumption which requires the employer to proffer legitimate, non-discriminatory reasons for its actions in question, whereupon the plaintiff would have the duty to produce evidence sufficient to create a factual issue as to the legitimacy of each and every one of the employer's proffered reasons. But in a RIF action, the employer's legitimate, non-discriminatory explanation is already present – the employer reduced the size of its work force.[11] Thus, in order to defeat the employer's summary judgment motion in a RIF situation, a plaintiff should present all the evidence available to him which indicates that a reduction-in-force was not the real reason for the employer's challenged actions.

---

We next inquire whether Newspapers's First has met its burden of producing evidence of a legitimate nondiscriminatory reasons fro offering the job to Malloy than to Isenbergh. . . . Here, Newspapers First met its burden of production, by asserting that Isenbergh was denied the managerial position because he was the less qualified of two applicants for the same job.

Newspapers First having met its burden of production, it fell to Isenbergh to show that the employer's proffered reason for the adverse employment decision was false and that discrimination was the real reason.

*Isenbergh,* 97 F.3d at 440.

[11]The *Earley* prima facie test for a RIF claim explicitly assumed that a job was "entirely eliminated for nondiscriminatory reasons."

Ash and Hithon contend that their demotions, and Bullock, Tanner, Thornton, and Davenport assert that their lay-offs, were acts of discrimination executed under the guise of a RIF. Therefore, in the instant case, as in almost every case, the summary judgment question is whether there exists sufficient evidence of whatever must be proven to avoid summary judgment and allow the case to be submitted to the finder of fact.

## TITLE VII and SECTION 1981 PROMOTION CLAIMS

### Ash/Dade[12]

Both shift manager positions became vacant in 1995, one in July and one in August. Ash told Hatley, who had come to Gadsden in June of 1995, that he wanted the shift manager's position that had just become open, the July opening.[13] Formal interviews were not conducted and the job was not posted. At the time, Ash had worked at the Gadsden plant for sixteen years, all in production. For the last three years, he was superintendent of second processing. As far as the court knows, Ash competently performed his job. Steve Dade, however, was awarded the job. Dade had been employed at the Gadsden plant for only two and one-half months. He had held the job of superintendent of maintenance and

---

[12] The defendant addresses Ash's promotion allegations as a "harassment" claim, but it seems clear from the complaint and the plaintiff's brief that Ash claims promotion discrimination.

[13] Although the defendant's brief states, p. 41, that Ash was "harassed" when he was not given either of the two shift manager positions, it is stated in the plaintiff's brief that Ash sought only the shift manager job which was given to Dade.

did not supervise anyone in production. Before coming to Gadsden, Dade had worked at

the Boaz plant in personnel, and later as shift superintendent of the dark meat de-boning

area. Dade had worked at Boaz for less than two years. When Hatley promoted him to

shift manager in June, 1995, Dade had no prior experience in production at Boaz or

Gadsden. The following are the written duties of shift managers and the qualifications for

that position.

SUMMARY:
This position is responsible for overseeing and supervising employees in the efficient, safe manufacturing of quality products in a manner that is consistent with company policies and procedures. This includes providing feedback to Plant Superintendents on quality and performance issues, guiding Supervisors to achieve personal and production goals by providing support and knowledge, and keeping Plant Managers informed of procedures changes and plant or personnel needs. Other responsibilities include ensuring that our products are coordinated, produced, and shipped on a timely basis, overseeing daily maintenance and the smooth mechanical operation of our processes, and coordinating production changes with shift changes and handling problem areas. Other duties include reviewing performance of all production lines with appropriate personnel, analyzing non-routine problems and offering recommendations, and performing other responsibilities as the need arises.

REQUIREMENTS:
Education: Requires education beyond high school including special training, vocational school, and/or college course.
Experience: 3-5 yrs.
Computer Skills: Requires elementary computer skills. For example, checking electronic mail, entering data into document templates, or creating simple queries.
Travel: 1-5 trips/yr.
Special Skills: (none)

Based on these facts, Ash contends that he was more qualified for the position than Dade.

Has Ash made out a prima facie case of discrimination? He is a member of a

protected minority; Dade is not. Although Ash did not formally apply and interview for

the shift manager's position, it appears that he did not because he was not given the opportunity to do so. The defendant's evidence is in accord: the job was posted company-wide, except at Gadsden.[14] Ash did, however, tell Hatley that he wanted the job. When an informal promotion system is used and there are no posting or formal applications received, the employer has a duty to consider all persons whom the employer knows might be interested. *Jones v. Firestone Tire and Rubber Company, Inc.*, 977 F.2d 527 (11th Cir. 1992). It is deemed that Ash "applied" for the first shift manager vacancy. The last test factor is whether, under the written job requirements, Ash was at least as qualified for the job as Dade. Ash's sixteen years' experience satisfied the experience requirement of three to five years, and it appears that Ash's experience would also satisfy the "special training, vocational school, and/or college course" requirement.[15] Dade, on the other hand, had worked for Tyson for less than three years and had no experience in production. Ash contends that Dade did not even meet the written qualifications.

It is concluded that Ash has established a prima facie case of intentional discrimination. Has the defendant articulated a legitimate, race-neutral reason for selecting Dade over Ash? Hatley testified that his selection of Dade was based on his belief that Dade was more qualified than Ash. Hatley wanted an individual for this high level plant

---

[14] It is not known whether posting was required or customary.

[15] It is assumed that Ash had a high school education.

24

management position who was not associated with existing management in the poorly performing Gadsden plant. He also wanted a person with a background in leadership. Hatley testified that he liked the fact that Dade had military experience, and that Dade took the initiative to "study the poultry operation at the plant and he often came up with innovative ideas." Hatley stated that he did not consider Ash because Ash did not approach him for an interview. It also appears that Dade had less than three years of experience, as required under the written qualifications.

In response, Ash sets out evidence which, he contends, if believed, establishes that those reasons are pretextual. Hatley told Ash that he would not be filling the position immediately but would work closely with and observe the performance of the current superintendents and decide who was more qualified. Hatley did not do this, but promoted Dade in a kind of summary fashion.[16] Ash does not contest Hatley's statement concerning Dade's initiative, rather Ash points out that Dade needed to study the poultry operation because he knew nothing about it. Moreover, after Dade became shift manager, Ash had to train Dade in production work. Ash states that there is no evidence that he was responsible for the poor performance of the Gadsden plant, and that Hatley never asked him about *his* military career. Ash further states that Hatley did not know Dade long enough to form an opinion as to Dade's trustworthiness, and that there was nothing

---

[16] After Dade was made shift manager, his pay went up two grades.

untrustworthy about him, Ash. Although a college education had not previously been a requirement for shift manager, and is not stated as a requirement in the written qualifications, Hatley told Ash that it was a requirement. Hatley further testified, however, that he did not know if Dade had a college education, but thought he did. Ash states that Tyson did not follow its own policies, and cites Personnel Policy Number 7.1, on seniority, which states in pertinent part: "Accrued benefits and rights for team numbers [sic] who establish seniority with the company are as follows: (1) transfer/lay-off/recall/promotion." *Plaintiff's Exhibit 19.* Ash asserts that there was also an unofficial policy at the Gadsden plant to promote from within if at all possible. Also, Ash points out that Hatley had testified in federal court on behalf of Tyson in a race discrimination suit, while Ash had testified on the side of the plaintiff employee.[17] If the defendant has articulated legitimate, race-neutral reasons for selecting Dade over Ash, Ash has submitted evidence sufficient to make a factual question for the jury. Tyson's motion for summary judgment on Ash's promotion discrimination claim should be denied.[18]

## Hithon/King

---

[17] Ash states that Hatley frequently called him "boy." The use of that term, if directed to black men and not white men, is an indication of racial prejudice. However, Ash stated that this occurred in November, 1995, which was after the alleged promotion discrimination. (Hithon states that Hatley once referred to him as "boy." However, Hithon told a co-worker that he was not offended because he did not know if the term was directed to him.)

[18] All that is before the court is the defendant's motion for summary judgment.

26

Hithon's claim concerns the shift manager slot which went to Randy King, a white man. Although the position was not posted in the Gadsden plant, Hatley interviewed Hithon for the second plant manager position to become open in the summer of 1995.

In 1995, John Hithon had been employed at Tyson, Gadsden, for thirteen years. From 1990 to 1994, he was superintendent in first processing. From 1994 to 1995, he was superintendent in second processing. At the time Hithon applied for the shift manager job, he had been sanitation superintendent for a brief period of time. In 1995, Randy King had been employed with Tyson for ten years. He had worked his way from maintenance supervisor, to eviscerating supervisor, to processing superintendent. His prior experience was only in first processing. King was new to the Gadsden facility when Hatley selected him to fill the second shift manager position to become vacant. Applying the *McDonnell Douglas* test, it is ruled that Hithon has made out a prima facie case of discrimination.

Tyson contends that Hatley's reasons for choosing King are non-discriminatory. As with Ash, Hatley met with Hithon shortly after his arrival to discuss Hithon's goals and interviewed him. Hatley testified that he selected King because he thought he was better qualified than Hithon and because he wanted individuals for these high level positions who were not associated with existing management.

The plaintiff responds that Hatley does not state why he thought King was more qualified. King testified that he had never met Hatley before his interview with him in

27

Gadsden. Neither did Hatley state what it was about Hithon's association with existing management which should remove him from consideration as shift manager. Although Hatley had said that a college education was a requirement, he did not ask King if he had a college degree because King's move to Gadsden was a lateral move and a college education is not required in a lateral move.[19]  However, King was not a shift manager at the previous facility and King received an increase in pay.  Again, a college degree is not a requirement for shift manager. The defendant's motion for summary judgment on this claim is due to be denied.

Bullock

Eddie Bullock was hired by Tyson in September, 1989, as second processing supervisor.  In 1990, Bullock became supervisor of first processing, third shift.  He was transferred to the Gadsden plant in 1992, where he was production supervisor, and later became deboning supervisor, second shift.  Bullock then moved to the first shift as production control supervisor.  In 1994 he became supervisor of live receiving.  Bullock then applied for the position of Waste Water Treatment Supervisor.  Hatley gave the job to Jeff Seymor, a white male.  At the time, Seymor was Waste Water Supervisor at the Blountsville facility.

---

[19]  King did not have a college degree.

It is doubtful that the plaintiff has shown that he was as qualified as Seymor, for Seymor was *doing* the job of waste water supervisor at the time. The defendant's non-discriminatory explanation of Hatley's choosing Seymor over Bullock, if one is needed, is that Tyson's Complex Manager thought that the Gadsden and Blountsville positions could be combined, in order to save money. Thus, putting waste water supervision for both plants in the hands of a current waste water supervisor, Seymor, simply increased Seymor's responsibilities. Bullock's response to this explanation is that although he does not dispute that money considerations were the reason for giving Seymor the additional responsibilities, Travis Tanner saw an identified white female, who was hired to work in the waste water department, performing supervisory duties.[20] If the defendant were required to give an explanation for its actions, Bullock's effort to show pretext with Tanner's statement is insufficient as a matter of law. Even if this woman was doing some supervisory work in the waste water department, there is no evidence that she was given the position of waste water supervisor, Gadsden, or that she was paid as waste water supervisor. Tyson is due summary judgment on Bullock's promotion discrimination claim.

## TITLE VII and § 1981 DEMOTION CLAIMS

---

[20] Although the defendant mentions in its brief other possible promotion claims of Bullock, he is making this one promotion claim only.

Having failed to obtain promotions to shift manager, Ash and Hithon assert that they were later demoted because of their race. As previously stated, Ash and Hithon were not removed from their jobs and replaced by other employees, rather the number of superintendents was reduced from six to four, and Ash and Hithon were made supervisors.

### Discussion

There is no question that Tyson conducted a company-wide RIF. In the case at bar, reputedly pursuant to the company-wide mandate to reduce costs and streamline operations, Hatley in the Gadsden plant decided, among other things, to reduce the number of production superintendents from six to four. The decision to reduce the number of positions was made first, and later it was decided which superintendents would lose their positions. A memorandum from Hatley, referenced by the plaintiffs, states such things as the focus should be on reducing positions, not people, and attrition should be used. *Plaintiff's Exhibit* 94. In spite of this, Ash and Hithon claim that the RIF was used as a cover to get rid of them.

Statistical evidence can indicate intentional discrimination or the lack of it, and the defendant stresses it in this case. A prima facie case of class-wide disparate treatment might be established by statistics alone if they are sufficiently compelling. *See Griffin v. Carlin*, 755 F.2d 1516, 1525 (11th Cir.1985); *Carmichael v. Birmingham Saw Works*, 738 F.2d

1126, 1131 (11th Cir. 1984); *Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 618 (11th Cir.1983), *cert. denied sub nom. James v. Tennessee Valley Authority*, 465 U.S. 1066 (1984). In an individual case of disparate treatment, statistical information "can be relevant and important." *Carmichael*, 738 F.2d at 1131. However, statistics alone cannot establish a prima facie case of individual disparate treatment. *See id.; Smith v. Horner*, 839 F.2d 1536, n. 8.

In Tyson's case, before the reduction in the number of superintendents, five of the six superintendents were black. After reduction, three of four were black. The defendant would have been in a somewhat stronger position statistically if the lone white superintendent, Ms. Leath, had lost her superintendent's position. If Leath had been selected, the percentage of black superintendents would have increased from 83 percent to 100 percent, instead of declining from 83 percent to 75 percent. While a decline from 83 percent to 75 percent might be viewed as slight, the value of these numbers is lessened by the fact that there were only six superintendents to begin with. However, it seems proper to consider supervisor statistics as well, since supervisor lay-offs were part of the RIF and it is contended that lay-offs were animated by racial motives. Additionally, Hithon and Ash were made supervisors.

Before lay-offs there were thirty-six supervisors, of whom fifteen or 41.6 percent were black, while twenty or 55.5 percent were white.[21] Excluding Ash and Hithon, five

---

[21] There was one Hispanic supervisor before the RIF. He was kept on.

supervisors were laid off, reducing the total number of supervisors from thirty-six to thirty-one. Of the supervisors laid off, three were black and two were white. Thus, the total number of black supervisors declined from fifteen to twelve, and the percentage went from 41.6 percent to 38.7 percent, while the number of white supervisors declined from twenty supervisors to eighteen, and the percentage went from 55.5 percent to 58.0 percent.

If Ash and Hithon are counted, there was a net loss of only three supervisors; that is, the total number of supervisors decreased from thirty-six to thirty-three. The number of black supervisors declined from fifteen to fourteen, and the percentage of black supervisors increased from 41.6 percent to 42.4 percent, while the number of whites supervisors remained the same, eighteen, and the percentage of white supervisors decreased from 58.0 percent to 54.5 percent. Thus, there was a net loss of one black supervisor and two white supervisors. These numbers indicate that race was not a determining factor in Gadsden's RIF decisions.

### Outspoken Superintendents

Ash and Hithon further assert, however, that they were selected because they were black *and for another reason*. They state that they were targeted because "[o]f the remaining superintendents Blake, Weatherspoon, Johnson, and Leath, the latter was the only white. Of the black superintendents, the Plaintiffs were more outspoken, and this was the fact that

was the rub bringing about the discriminatory treatment." *Plaintiffs' Brief*, pp. 77-78. It is possible that a racially prejudiced white person would take adverse action against an *assertive* black person, while he would not take adverse action against an equally assertive white person or a *non-assertive black person*. In such event, race discrimination would be a motivating factor. On the other hand, getting rid of "troublemakers," regardless of color, simply because they are troublemakers, is not actionable discrimination.

In support of Ash's and Hithon's assertions that they were "more outspoken" than the other three black superintendents, the plaintiffs' brief references certain depositional testimony. This testimony shows that Hithon talked to Hatley about his demotion and the proposed reduction in pay.[22] Also, it can fairly be found that Hithon, by standing in Hatley's office when Hatley, who appeared angry, did not sit, Hithon "stood up for himself." This conversation between Hatley and Hithon, however, obviously took place after the decision to "demote" Ash and Hithon had been made. The plaintiffs' brief does not reference any other interaction between Hatley and Hithon which Hithon contends demonstrates that he was "outspoken." Ash has not referenced any evidence in support of his assertion that he was an "outspoken" black superintendent. Although Ash and Hithon state in the plaintiffs' brief that Johnson, Blake, and Weatherspoon were *not* outspoken blacks, *Plaintiffs' Brief*, p. 81, Ash and Hithon have not referenced evidence

---

[22] Hatley changed his mind about reducing Ash's and Hithon's pay when they assumed their jobs as supervisors.

which indicates that at the time the superintendent reduction decisions were made, Johnson, Blake, or Weatherspoon were docile or simply tolerated unfair treatment.

If Ash and Hithon were selected on the basis of performance, a look at the performance of the other superintendents would be in order. If there is evidence that the other black superintendents had performance problems equal to or greater than Hithon's or Ash's, the selection of Ash and Hithon instead of the other black superintendents could indicate racial discrimination *if*, according to the plaintiffs' own contention that "outspokenness" was the discriminatory animus, there is evidence sufficient to support a finding of such outspokenness.

It is opined that there is not evidence sufficient to establish that Ash and Bullock were more outspoken than other superintendents. For the sake of further discussion, however, it will be assumed that they were. If they were, the plaintiffs have established a discriminatory animus, and the next question would be whether this prejudicial disposition was acted upon.

## Evidence That Prejudice Was Acted Upon

Ash and Hithon state the issue: "[t]he question becomes who management could have chosen for demotion when its options are compared with its written policies and the relative qualifications and experience of the pool of available people to be eliminated."

*Plaintiffs' Brief,* p. 82. Ash and Hithon contend that if saving money and streamlining operations were truly the RIF criteria applied at Gadsden, Ash's and Hithon's superintendencies would not have been taken away, for there were better ways to serve the purposes of the RIF. These plaintiffs assert that the persons who selected them were some times inconsistent in their actions and in their statements concerning the RIF, they did not follow written policy, or their evaluations of personnel were faulty for one reason or another.

Thoughtless, stupid, or unfair business decisions, or even lying about the reasons for having made them, are not, in and of themselves, actionable. Ash and Hithon, of course, assert that more is involved. They contend that those thoughtless, stupid, or unfair business decisions, or lying about the reasons for them, *indicate* that Ash and Hithon were discriminated against because they were more "outspoken" than the other black superintendents, and indicate, with respect to Leath, the sole white superintendent, that they were discriminated against because they are black and she is white.

What evidence, then, is there that Dade or King, who selected Ash and Hithon, or Hatley, who made the final decision, acted against Ash and Hithon because they were black and outspoken?[23] Do comparisons between Ash or Hithon on the one hand, and the

---

[23] Again, the evidence analyzed in support of this claim is limited to that referenced by Ash and Hithon in their discussion of this issue in their brief.

remaining superintendents on the other, or comparisons between production and non-production employees, indicate that the defendant's reasons for demoting Ash and Hithon are racially suspect?

*Production v. non-production personnel*: Even though the home office in Springdale stated that *non-labor* (non-production) payroll was to be reduced by 5 percent, Ash and Hithon lost their *production* superintendencies. The racial make-up of the production superintendents and supervisors is known and have been set out in this opinion. As to the racial make-up of non-production personnel, the plaintiffs state that "the maintenance and accounting departments were all white." *Plaintiffs' Brief*, p. 89. The plaintiffs reference page 311 of Dade's deposition, in which he states that he "guesses" that most of the workers in the maintenance department are white.[24] In this excerpted testimony, Dade does not mention the accounting department. This testimony is too vague to allow a racial, much less any other kind of comparison, of production and non-production personnel. *See Montana v. First Federal Savings And Loan Association of Rochester*, 869 F.2d 100, 107 (2nd Cir. 1989). Also, as plant manager, Hatley had to decide what was best for the Gadsden facility. It is noted that the Memorandum from Springdale "*challenged*" the plants "to reduce [their] salaried and office clerical payroll by *at least* five percent." *Plaintiffs' Exhibit* 94 (emphasis added). It has already been noted that Gadsden had problems the average Tyson plant did

---

[24] The plaintiffs also reference Higgins' depositional testimony, page 51. They have not, however, submitted any portion of Higgins' deposition.

not have. It is further noted that it was also recommended that four clerical positions and one nurse's position be eliminated, and that there could be a reduction in hours for some remaining clerical positions.

*False reasons for selecting Ash and Hithon:* The plaintiffs' brief points out evidence which they contend indicates that the selection of Ash and Hithon went against sound business judgment and that the reasons given by Dade for the demotions were false.

> In the demotion meeting, Mr. Dade told Mr. Hithon he was selected due to certain character flaws and performance problems. In the same meeting, Mr. Dade proclaimed the decision was not based on performance. In his affidavit, Mr. Dade says after an assessment of "attention to detail, enthusiasm, attitude, time spent on the production floor," Mr. Ash and Mr. Hithon were selected for demotion.

*Plaintiffs' Brief,* p. 80. The plaintiffs also point out that, "[i]n his affidavit, Mr. Dade says after an assessment of 'attention to detail, enthusiasm, attitude, time spend on the production floor' Ash and Hithon were selected." *Dade Affidavit; Plaintiffs' Brief,* p. 80. The defendant in its brief also references Dade's affidavit, wherein he states that Hithon did not have a good relationship with the USDA inspectors, he was not a "hands-on" manager, and he did not train his subordinates well. The plaintiffs contend that statements that performance was the reason for Hithon's selection and a statement that performance was not a reason for selecting Ash and Hithon is evidence that race was a motivating reason.

37

*Outspokenness of other superintendents/Seniority:* The plaintiffs state their need to show

that Ash or Hithon were treated differently from the other four superintendents in ways

which suggest racial discrimination:

> Ms. Leath had only been exposed to the production area for a few months over the past six (6) years and it was in further processing, not evisceration. Ms. Weatherspoon had been a superintendent in evisceration only for a shorter period of time than either Plaintiff, and along with Mr. Johnson and Mr. Blake did not speak out to management, or complain. *See,* discussion *infra*."

*Plaintiffs Brief*, p. 81. The plaintiffs further state:

> This demotion decision, if necessitated by there simply being too many superintendent positions, did not follow the written seniority policy since Mr. Ash had more seniority than Tanya Weatherspoon. Moreover, Ms. Weatherspoon had only been a superintendent in evisceration for six (6) months. Donna Leath until November, 1995, had been the Warehouse Superintendent and had not been associated with production for at least six years. So at the time of the demotion, there was already one superintendent position that had been determined unnecessary — hers. Moreover, she was counseled by Mr. Dade for absenteeism on the very morning he demoted the Plaintiffs. The decision to move Ms. Leath was made because of the pending demotion and lay-off. This move, then, could certainly be perceived to have been made in order to provide her with some recent production experience and justify, if possible, passing her over for demotion.
> 
> A reasonable juror could certainly believe this to be true, especially combined with the prior discriminatory treatment of Mr. Ash and Mr. Hithon by the same decision-makers, the flip-flop on the basis of the selection, the failure to follow the seniority policy, and Mr. Hatley's personnel actions prior to the time the company announced a cut-back.

*Id.* at 82-83. The statement that most of Leath's superintendent experience was not in

production is the plaintiffs' response to the defendant's statement that Leath had more

seniority than either Ash or Hithon.[25] If there is "discussion, *infra*" of evidence that

---

[25] The seniority ranking of the superintendents, in descending order, was as follows: Bobby Johnson, black male; Donna Leath, white female; Anthony Ash, black male; James Blake, black male; John Hithon, black male; and Tanya Weatherspoon, black female.

Weatherspoon, Johnson, and Blake did not speak out or complain, it has been inadvertently overlooked.

*Unwise business decision*: Ash and Hithon further state that Gadsden would have better applied the Springdale mandate if a white male maintenance manager, Gene Hammond, who had serious performance problems, had been fired and Hithon given his job. The plaintiffs remind the court that the mandate stated that "[e]ach of our plants need to evaluate non-production jobs," and assert that it would have been more financially advantageous to have taken other actions. Again, however, the plaintiff's evidence, to be probative of intentional discrimination, must show that these plaintiffs were treated differently from those similarly situated persons named by Ash and Hithon — the three black and one white fellow superintendents, for the reason that the plaintiffs were "more outspoken" than the others were.

*Promotion discrimination evidence*: Ash and Hithon state that they rely upon the evidence that Hatley discriminated against them with respect to their promotion claims. It has previously been determined that there is sufficient evidence of promotion discrimination against Ash and Hithon by Hatley for those claims to proceed. It is assumed for the sake of this discussion that a discriminatory animus in one situation could be evidence of a discriminatory animus in a later situation. In that event, promotion discrimination evidence could be considered in Ash's and Hithon's demotion claims, as

39

long as Hatley is sufficiently linked to the demotions. Although Hatley made the shift manager promotion decisions, Dade and King, were the main actors in the selection of Ash and Hithon for demotion;[26] they recommended that Ash and Hithon should be the ones to lose their superintendencies, and Hatley approved the recommendations. The evidence is insufficient to show that Hatley influenced Dade's and King's decision.[27]

*Conclusion*:  The probative value of evidence that Hatley referred to Ash as "boy," and the probative value of Dade's "Martin Luther King" comment, are slight at best. The plaintiffs have pointed out that on one occasion --- the "demotion" meeting --- Dade said that Hithon was not selected because of performance.  In that same meeting, however, Dade said that "character flaws and performance problems" were the reasons for their selections.  The other evidence is consistent with Dade's "character and performance" statement.  Moreover, the plaintiffs have consistently attacked the  defendant's use of the "team player" criterion.

---

[26] The plaintiffs point to Dade's testimony that he would "stop a bullet for Hatley." Also, the plaintiffs orally asserted that the only part King played in the decision of which two superintendents would lose their positions was his statement that he wanted to keep "his" two superintendents, and, therefore, it was Dade alone who selected Ash and Hithon. If Dade acquiesced to King's wish that he wanted to keep "his" superintendents, there was an agreement between Dade and King that those two superintendents should stay. The result of that joint decision was that the number of superintendents from which to select was reduced by two, thus increasing the chances that Ash and Hithon would be selected.

[27] In the "Lay-off" discussion, *infra*, the plaintiffs set out evidence they contend shows that Hatley influenced the lay-off recommendations.

While the determination of whether evidence is insufficient as a matter of law is often a difficult one, it is opined that there is not sufficient evidence to support a finding that Ash or Hithon were more outspoken than the other black superintendents (or Leath). There is insufficient evidence to support a finding that production instead of non-production employees were laid off for the purpose of demoting Ash and Hithon. The evidence is insufficient to support a finding that Dade discriminated against Ash or Hithon for Hatley's sake or with Hatley's knowledge and acquiescence. As to Leath's not being selected, the plaintiffs state that in 1995 Hatley frequently referred to Ash as "boy." Without more, this cannot be considered a racially prejudiced remark. Also in 1995, Dade told (unnamed) laughing white maintenance supervisors about an employee who had worked as an aide to Martin Luther King. Dade said that although that employee thought King was great, the employee was lazy and his work was poor. This comment is at best ambiguous.

If not probative, the views of Ash and Hithon on the RIF, and in particular their demotions, are at least noteworthy. Hithon testified that he thinks he was a victim of race discrimination because he felt he was "being set up" and because he did not receive a cut in pay when he was moved from superintendent to supervisor. *Hithon Deposition*, pp. 141-143; 227-28. Ash testified that he would have considered himself a victim of race discrimination even if the lone white superintendent, Leath, had lost her superintendent

41

position, for the reason that elimination of any superintendency was simply unfair. *Ash Deposition*, p. 95

It is concluded as a matter of law that, in spite of the fact that Leath kept her job as superintendent, the evidence is insufficient to support a finding that race was a motivating factor in the selection of Ash and Hithon as the two superintendents who would lose their positions. Whatever the reasons for selecting Ash and Hithon, whether good or bad, wise or unwise, race was not a motivating factor.

## LAY-OFF CLAIMS

Hatley told the four remaining superintendents --- two black males, one black female, and one white female --- that since they were responsible for the success of their departments, they, along with the two white shift managers, should be the ones to decide which supervisors should be laid off. The goal of this "committee" was improved production.[28] The superintendents did not review personnel files, but based their decisions on their work experience with the various supervisors. The committee recommended that six supervisors be laid off. Those selected for lay-off were four blacks --- Travis Tanner, Eddie Bullock, Vivian Thornton, and Martha Dupree --- and two whites --- Robin Davenport and Greg Tolbert. Hatley accepted all recommendations except one. He

---

[28]The list provided the superintendents included only production supervisors. Maintenance, warehousing, supply, and qualify control supervisors were not on the list.

rejected the recommended lay-off of Martha Dupree, one of the two black females. The questions before the court are whether any of the black supervisor plaintiffs — Tanner, Bullock, or Thornton — were laid off because they were black, and whether Davenport was laid off because she was dating a black man or because of her sex.[29]

Statistics

First, statistics will be examined. Three black and two white supervisors were laid off. As previously stated, Ash and Hithon were made supervisors, and so, counting them, there was a net loss of three supervisors, one black and two white. The statistics of black and white supervisors before and after the supervisor lay-offs are stated in the discussion of Ash's and Hithon's demotion claims, *supra*.[30] These statistics, which the defendant contends are important, even dispositive, indicate that Bullock, Tanner, and Thornton were not selected for lay-off because of their color. If Davenport is claiming that she was laid off because of her sex, statistics do not support her claim either. Before the lay-offs, nineteen of the thirty-six supervisors were female. Afterward, eighteen of thirty-three were female. The percentage of female supervisors actually increased slightly from fifty-three

---

[29]In Count I of the complaint, the Section 1981 count, Davenport alleges that she was laid-off because of her statement to Hatley that she was dating a black man. (She was laid off about a month after she made that statement. She was recalled in May, 1996.)

[30]The plaintiffs assert that the lay-offs of Davenport and Greg Tolbert should not be totally regarded as lay-offs of white supervisors, for Davenport was a "black sympathizer," *Plaintiffs' Brief*, p. 91, and Tolbert was planning to leave Tyson anyway.

percent to fifty-five percent. If Ash and Hithon are not counted, the percentage of female

supervisors increases.

Outspokenness

These supervisors contend that the reason for discriminating against them was their

"outspokenness." As Ash and Hithon contended, so contend Bullock, Tanner, and

Thornton. They state that: "[T]om Hatley, and/or through shift manager Steve Dade,

actually targeted and laid off blacks who spoke out or offered recommendations for

improvement or opposed the existing system." *Plaintiffs' Brief*, p. 86. Davenport, a white,

makes the "outspokenness" argument also.

First, what evidence is there that Bullock, Tanner, Thornton, and Davenport were

more outspoken than other superintendents? The plaintiffs state in their brief:

> Mr. Bullock deigned to complain about not receiving a promotion over a white
> applicant, (*Bullock Affidavit*, p. 2); Mr. Tanner, about not being able to go to the same
> job on first shift even though policy or custom provided for it and a white male was
> given the position (*Tanner Affidavit*, pp. 1-2; *Dade Deposition*, p. 334); Ms. Thornton,
> about not receiving training (*Thornton Deposition*, p. 38); and Ms. Davenport,
> snubbing the social order by dating a black man. (*Davenport Affidavit*, pp. 1-2)."

*Plaintiffs' Brief*, pg. 87.

> *Bullock*: Bullock states in his affidavit:

> In September, 1995, after Thomas Hatley became plant manager, there was
> an opening for supervisor in the waste water treatment. On October 3, 1995, the job
> was posted and I informed Ever Higgins, the personnel manager, that I would like
> to apply for the position since I met the qualifications for the position that was
> available. When I didn't get called for an interview, I approached Ms. Higgins again

44

and she advised me to call Mr. Tom Hatley, the plant manager. I spoke to Mr. Hatley in person and asked him if the waste water treatment position had been filled and he informed that it was still open. I never did get an interview for the waste water treatment position, but Joey Broom, a white male did.

I was later told by Mr. Hatley that Jeff Seymour, an employee at Tyson's Blountsville plant, who worked in their waste water division, would be handling the waste water treatment area at the Gadsden and Blountsville plants. Within one or two weeks, a white female was moved into the waste water position. I actually observed her supervising the employees. I talked to Clarence Wilson about the situation. Mr. Hatley stopped in the parking lot one day as I was headed home, and asked me to come to his office to talk to him. He told me he had heard I was upset about the waste water situation and having to go on nights. He mentioned to me that he knew I was going to college to get my Master's degree. After I filed a charge with the EEOC, the white female was transferred out.

*Bullock Affidavit,* pp.1-2. Bullock further stated that he "talked to Tanya Weatherspoon

about [his] being transferred to third shift." *Id.* at 3. He then "talked to Mr. Clarence

Wilson, the complex personnel manager about the live hang position." *Id. See* also

Weatherspoon's notes of the superintendents' meeting, *infra.* The court deems that this

evidence indicates that Bullock was not afraid to and did assert himself when he thought

he was being treated unfairly.

*Thornton*: Vivian Thornton testified:

I went to Tom Hatley the same day, and I talked to him. And Tom told me that I was definitely going to second shift, and he told me that he thought I knew that I was going to second shift. I told him that I did not know. He apologized to me for the way things were being handled.

When I decided that I was to go back to second shift, I asked for a decision-making leave of absence. Tom granted the leave.

. . .

I took the leave of absence. During the leave of absence, I challenged the decision of my going to second shift with Mark Wohler. Mark Wohler told me that he would talk with Tom. He talked with Tom. Tom had Steve Dade to call me to set up a meeting with me.

Before the meeting was actually set up, I found a job at the Oxford hatchery. I went to Tom. I told Tom that I wanted to transfer. Tom assured me that I did not need to transfer because once I got out of management, it would be hard to get back

45

into management. He assured me that we could work out a plan for me to stay in Gadsden on first shift.

*Thornton Deposition,* pp. 37-39. Thornton further states that when she returned from lay-off she complained to King and Johnson about a lack of training. *Id.* at 35-36. This evidence indicates that Thornton also had "stood up" for herself.

*Tanner*: The evidence referenced by Tanner in the plaintiffs' brief shows only that he requested a certain shift and, after he was laid off, asked if he could work as an hourly worker. Tanner did ask James Blake "why management wouldn't allow [him] to take the Portion Control position." *Tanner Affidavit,* p. 3.

*Davenport*: Davenport's alleged "outspokenness" was telling Hatley that she was and had been dating for years a black man, an hourly-wage worker at Gadsden.

*Conclusions*: It is concluded that the evidence could support a finding that Bullock and Thornton were "outspoken," but not Tanner. As to whether Bullock and Thornton were more outspoken than superintendents who were not laid off, the plaintiffs state that Blake was turned down by Hatley for the job of shift manager after having been told that he had to have a college degree, but Blake did not complain, not even after learning that King did not have a college degree. Neither did Blake complain when he was passed over for other promotions. The evidence is insufficient to support a finding that the "outspokenness" of Bullock and Thornton caused them to stand out from the other supervisors, and therefore "outspokenness" cannot be found as the animus for their lay-

46

offs. The fact that Tanner, who was not outspoken, was also laid off, indicates that "outspokenness" was not a reason for discrimination. Nevertheless, the next question will be asked, which is what evidence is there that Hatley, Dade, or King *actually acted on* their assumed prejudice against outspoken blacks?

The answer to this question requires setting out Tyson's reasons for laying-off Bullock, Tanner, and Thornton, and then determining whether those reasons applied as much or more to supervisors who were *not* laid off. If they did apply just as well to non-laid off supervisors, then such evidence provides indications of discrimination. As to Davenport, it is questionable that her revelation to Hatley of the fact that she was and had been dating a black man can fairly be termed "outspokenness," but her claim that this disclosure was the cause of her lay-off might at least state a viable §1981 claim, and therefore her evidence of discrimination will be examined in the same way.

<u>Evidence That (Assumed) Prejudice Was Acted Upon</u>

Hatley wanted the best "team players." The plaintiffs assert that Hatley's "team player" test fits within the definition of subjective criteria noted in *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 644 (11th Cir. 1998): "[R]equirements such as the possession of 'initiative and judgment capabilities' and the 'ability to relate to people in a

47

manner to win confidence and establish support' are incapable of objective evaluation."

*Carter,* 132 F.3d at 644. The plaintiffs condemn Hatley's "team player" test for its subjective

nature, as subjective evaluations "provide a ready mechanism for racial discrimination."

*Miles v. M.N.C. Corp.,* 750 F.2d 867, 871 (11th Cir. 1985). Examples of objective criteria

would be test scores or educational requirements. The following reasons given for the lay-

off selections, although largely subjective, can nevertheless be compared with the traits of

supervisors who were not laid off.

Weatherspoon, on her own initiative, took notes of the meeting where the four

remaining superintendents, with shift managers Dade and King in attendance, discussed

and decided which supervisors to recommend for lay-offs. Those notes state:

> On the morning of Jan[uary] 9[th], [19]96 at 8:00 a.m., I attended a meeting
> with the following people. Tom Hatley plant manager, Steve Dade - Shift manager;
> Randy King - shift manager; James Blake, Donna Leath, Bobby Johnson, and myself,
> Tanya Weatherspoon. All superintendents. The meeting begin with the plant
> manager telling how the plant had been losing money and that a lay-off of
> managers was about to take place. He talked about the demotion of 2
> superintendents to front line supervisors. He talked about what was expected of
> the chosen 4 superintendents. He stated that if our job performance wasn't
> acceptable disciplinary action would be taken. We were told that from the list of
> front line supervisors choose people who could and would help get the plant up
> and running in a profitable, efficient manner.
>     Job performance, dependability, [enthusiasm] toward job, acceptance of
> changes, flexibility.
>     From the list of front line sup[ervisors] that were chosen to keep, it was
> stated by one of the shift managers or plant manager that if one of the sup[ervisors]
> job performance wasn't up to par — we could call one of the supervisors on lay off.
> We went down the list and put in numerical order whom we would call back if it
> came down to that.
>     Martha Dupree — worker — not a manager; no people skills.
>     Robin Davenport — lazy — don't accept changes, get discourage quickly —
> need motivation on a hourly/daily basis. Being a manager some since of
> motivation is instilled within, with Robin its different.

Greg Tolbert — I had no opinion.
Travis Tanner — [I had no opinion].
Arlene Wyatt — short temper, doesn't work well with people.
Donna Leath stated was doing better.
Mattie Spiegler — Retiring soon, get excited quickly, easily over nothing. But a go getter. Dependable, over reacts sometimes only on the floor about problem (work).
Mary Waters — lazy, hides from work. Look for reasons not to work. Don't take care of her line problems but keep up with other people problems.
Eddie Bullock — he hated 3rd shift. Was angry about several incidents in which he felt he had been mistreated. Eddie had an attitude because he was made to come to 3rd. I requested Joe Hill when Hardee's dept went down; Eddie was told that he was the less senior live receiving manager so he had to go — then he found out Rodney White ran live receiving for a brief period of time and wasn't made to go this time. He stated that he heard Rodney say he wasn't going to live receiving and that made him very angry. He questioned me about Rodney's comment but I told Eddie to may knowledge Rodney was talked to about going to live receiving — and I never heard him say that he wouldn't go.

*Plaintiff's Exhibit 56.*

In addition to Weatherspoon's notes, the four superintendents have submitted affidavits stating the comments made by the shift managers and the four superintendents during their meetings. Pertinent statements in those affidavits will be set out. The Weatherspoon notes and the affidavits show that job performance, dependability, enthusiasm for the job, acceptance of changes, and flexibility were considered by the committee. In his affidavit, James Blake stated that their task was to select the "better performers:"

The two shift managers and four superintendents went over the list. They looked at the type of supervisors we needed to turn the plant performance around. They wanted to pick the best team. That is not to say that ones not picked were not good — but it was good performers vs. better performers. Vivian Thornton and Greg Tolbert were unanimous because they did not fit these parameters. The group reached consensus about each supervisor.

*Defendant's Exhibit U, Blake Affidavit.* Dade's affidavit states:

> When the supervisors were selected for lay off the four remaining superintendents and the two shift managers made the decisions. The shift managers sat away from the superintendents. Dade kept the "master" roster and Weatherspoon went down the list. King nor Dade spoke first. They group went rapidly through the list the first time. Vivian Thornton was a given up front because of performance problems. Made a second list and then made the final decision. The group decision on Davenport surprised Dade. Superintendents said lazy and negative. Shift Managers did not over rule decisions.

*Id., Dade Affidavit.*

*Bullock*: Tyson submits that "the group agreed that Bullock 'had a chip on his shoulder,' and probably would not be a good team player. Black superintendent Weatherspoon did not want Mr. Bullock to work for her because 'she knew that he would not do a good job' and 'she chose those that would work the hardest for her.'" *Defendant's Brief,* p. 68 (evidentiary references omitted). Weatherspoon's notes state that the chip on Bullock's shoulder stemmed from his belief that the company had mistreated him. Blake's affidavit stated that King and Weatherspoon had problems with Bullock on third shift. Johnson's affidavit stated that although Bullock would work for him, Bullock probably would not work anywhere else as well, and that Bullock was "...resentful toward the company because he was moved where he didn't want to be. May have been because Bullock didn't get position he wanted at Heflin." Defendant's *Exhibit U, Johnson Affidavit.* King's affidavit recorded that although Johnson wanted to keep Bullock, Johnson acknowledged that Bullock had a bad attitude, while Dade's affidavit said that Johnson was

not adamant in his, Johnson's, support of Bullock. The consensus was that Bullock should

be one of those laid off.

> *Thornton*: Tyson asserts:

> The affidavits of the four superintendents who recommended supervisors for lay-off demonstrate a unanimous decision that Ms. Thornton was not an employee who could help turn around the performance of the Gadsden plant. Ms. Thornton's superintendent at the time of the lay-off, Bobby Johnson (black male), indicated that she had performance problems. Former superintendent James Blake (black male) states that he had problems with Ms. Thornton over the years and considered her an inconsistent performer. Donna Leath indicated that Ms. Thornton was not good with people or paperwork and had been a problem in every department in which she had worked. Tanya Weatherspoon (black female) testified in her deposition that she felt strongly that Ms. Thornton should be one of the employees included in the lay-off. Ms. Thornton's subordinates had complained about Ms. Thornton, which would indicate that she was not the type of team player the management of Tyson was looking for.

*Defendant's Brief*, pp. 63-64 (evidentiary references omitted).

The affidavits show the following. Thornton was on probation at the time of the lay-

off discussions. Blake stated that Thornton was an inconsistent performer and that he had

had problems with her for years. Dade stated that it was *unanimous* that Thornton should

be laid off. Leath said that Thornton used to have a problem with absenteeism, that she

was not good with people or paperwork, and that she was a problem everywhere she went.

Weatherspoon stated that she was not discussed at the group's second meeting because

"[Thornton] was a given coming in." Defendant's *Exhibit U, Weatherspoon Affidavit*.

*Tanner*: The plaintiffs point out that Blake said Davenport was lazy, and submit that Tanner's name was brought up for lay-off consideration even though Blake knew Tanner had never been "written up." Blake's affidavit states:

> Blake felt [Tanner] was ineffective. When Blake went to him with a problem in his area he could not solve it. Tanner was in a high dollar area and could not do what Blake told him after he solved the problem for him. Blake had people come to him because of Tanner showing favoritism. Tanner was inconsistent in his application of discipline. Blake overrode his decision on two occasions because he didn't think the people needed to be fired. Blake counseled Tanner verbally, but not with a written warning. Performance had fallen off a lot during the last month. Tanner had high turnover.

*Exhibit U, Blake Affidavit.* Leath in her affidavit noted that Blake said that Tanner had "no enthusiasm or digging into the job — just sort of there." *Exhibit U, Leath Affidavit.* Johnson criticized Tanner's productivity. Dade stated in his affidavit that it was *unanimous* that Tanner should be laid off.

*Davenport*: Davenport states that her name was brought up even though her last write-up was three years old. Davenport points out that Leath said she was excellent with paper work. Davenport further states that Hatley told her that she was not laid off because of performance.

Weatherspoon's notes show that it was stated during the meeting that Davenport was lazy and needed constant motivation. Dade's affidavit shows that Blake, Leath, and Weatherspoon expressed the opinion that Davenport was lazy. Weatherspoon states in her affidavit that "[w]hen Weatherspoon was a line supervisor she would get aggravated

because Davenport stayed in the office too much. Davenport seemed not to care about he job. Others felt she was lazy. Weatherspoon chose Waters over Davenport or Dupree because Waters was new and could be developed." *Id., Davenport Affidavit.* In Blake's affidavit it is stated that Davenport did paperwork for other supervisors in order to stay off the floor.

*Supervisors not laid off*

1. Sylvia Wyatt: Weatherspoon's notes state that it was said that Wyatt had a short temper and does not work well with people. The affidavits show that Wyatt had poor "people" skills, but that Leath had been working with her and she was doing better. Johnson stated he had no problem with her. King's affidavit states that Blake, Johnson, Weatherspoon, and Leath thought that Wyatt was better regarded when compared with others.

The plaintiffs, however, state that Superintendent Johnson wanted to lay-off Joe Hill and Sylvia Wyatt for performance reasons, but agreed to keep Hill after his,

Johnson's, efforts to keep Bullock were unsuccessful.[31] They cite *Exhibit O, Johnson Deposition*, p. 12, in support of this statement. Johnson's actual testimony is as follows:

> I had two supervisors that worked under me that I felt needed some more training or whatever, wasn't coming up to — one of them was Joe Hill and one of them was probably Arlene Wyatt. . . . They were lacking in certain areas. . . . Did I ever vote to keep them? . . . At the end I did. When I found out [Bullock] would probably be leaving the plant, I made a suggestion that Joe Hill would be the one that filled that spot.

*Johnson Deposition,* pp. 11-12.

2. Martha Dupree: The opinions stated in the affidavits were that Dupree was a very hard, even the hardest, worker, but that she lacked supervisory skills. Dupree was the supervisor whose recommended lay-off was not accepted by Hatley. Another supervisor was not, however, laid off in place of Dupree. There was simply one less supervisor laid off.

---

[31]The plaintiffs contend that it can be inferred from these and other facts that performance was not consistently used as a criterion. The plaintiffs further state that although Tyson contends that the reason for the lay-offs was elimination of supervising positions, only three positions were actually eliminated. In support of this statement the plaintiffs reference page ninety-six of Thornton's deposition; however, this page of testimony is not included in those pages of Thornton's deposition submitted to the court. The plaintiffs also state on page 110 of their brief that Davenport was replaced by a male who had less seniority than she did. Unless it has been overlooked, the plaintiffs have not referenced evidence to support this statement. As previously stated, there was a *net* loss of only three supervisors, as Ash and Hithon became supervisors when the number of superintendents was reduced from six to four. The plaintiffs do not contend, however, that Ash and Hithon took the jobs of other supervisors. Although Davenport states that a white male replaced her, she is not making a termination-of-employment claim. (Davenport has a gender discrimination claim which is discussed in the "Gender Discrimination" section of this opinion. It is noted that job openings several months after discharge cannot be considered satisfactory proof of an open position at the time of termination. *Earley v. Champion International Corp.,* 907 F.2d at 1082-83.)

3. Mary Waters:  The Weatherspoon notes state that Mary Waters was lazy and hid from work.  The affidavits show that Waters' work and attitude before pregnancy were criticized, but both improved after Waters returned from maternity leave.  Waters was one of the strongest of the supervisors under consideration for lay-off.

4.  Matter Speigner:  Although there was a comment that she was a good worker, there was some criticism of her work. It was also stated that Speigner had problems controlling her emotions, but the group thought that problem could be handled. In King's affidavit it was stated that Johnson and King said that Speigner was very ill-tempered, but she worked well with her people and worked hard. Weatherspoon's affidavit recorded the comment that Speigner had spoken of retirement and the group kept her because of her seniority and because she excelled in evisceration. Speigner could do anything her superintendent needed done.  In Bobby Johnson's affidavit it is stated that Dade commented that "he felt that [Sylvia Wyatt] worked pretty good.  Has a problem dealing with people.  Has seen a lot of improvement.  Leath stated had seen improvement." *Plaintiffs' Exhibit U, Johnson Affidavit.*

4.  Greg Tolbert:  The affidavits of all superintendents state that Tolbert was an undesirable worker for many reasons, including poor performance.

5. Ede Wildman:  Weatherspoon's notes record the comment that Dupree was a good worker, but not a manager, and had no "people skills."  The affidavits show that

the superintendents thought that Wildman had performance and/or disciplinary problems. The committee discussed the fact that Wildman had been on suspension within the last year, but it was decided that the suspension would not keep her from being a good team member.

6. Bill Jenkins: The plaintiffs state that Jenkins was discussed by the committee, even though he was a non-production (warehouse) supervisor. Jenkins had several write-ups in his file, including suspension and probation, along with complaints of racial discrimination.

*Seniority:* The plaintiffs state that supervisors with less seniority than they were not laid off. In particular, Scott Batson, with less than one year's experience, replaced Davenport, a 16-year veteran with the company, and Rafael Soto, with three months service, was not laid off.

*Other evidence of discriminatory animus:* The plaintiffs again submit the evidence of discrimination by Hatley set out in the Ash and Hithon demotion claims, as well as Dade's allegedly demeaning racial remarks. Apparently anticipating the retort that Hatley did not make the selections, but merely accepted or rejected the recommendations of the committee, half of whom were black — two shift managers and one superintendent were white; three superintendents were black — the plaintiffs attempt to involve Hatley in or connect him to the selection process itself. The plaintiffs state that it appears that the

56

discussion of lay-offs began before Hithon was moved to second processing, and that Leath

was moved around in superintendent work in anticipation of the lay-offs. The plaintiffs

state that Hatley limited the pool by focusing on production personnel. Before the

committee met, Dade had turned in a list of jobs that could be eliminated.[32] After Hatley

addressed the meeting, Dade said "we are going to eliminate x amount of jobs in debone

and this is how we're going to do it." *Plaintiffs' Brief*, p. 89. Hatley vetoed one of the

committee's selections, and he "changed the placement of several others." *Plaintiffs' Brief*,

p. 90. Dade reversed his decision to cut the pay of Ash and Hithon when they moved from

superintendent positions to supervisor positions. Dade testified in his deposition that he

would "stop a bullet for Hatley." The plaintiffs assert that Dade knew who was going to

be laid off before the committee met, and reference the affidavit of Regina Wright. Wright

"volunteered" to be one of those laid off, because she wanted to spend more time with her

baby. She states:

> Mr. Dade informed me that I could not volunteer for a lay off. Further, Mr. Dade
> remarked with a smirk that I was not going to be one of those to be laid off. When
> I asked Mr. Dade what he meant, he would not remark further." *Wright Affidavit*,
> p. 1. Dade testified in his deposition that he would "stop a bullet for Hatley." The
> plaintiffs assert that "Ms. Weatherspoon's notes reveal he literally threatened them
> with their jobs if they essentially failed to do the right thing." *Plaintiffs' Brief*, p. 90.
> Thus, the plaintiffs contend that there "[i]s sufficient evidence from which a
> reasonable juror could infer Tom Hatley and Steve Dade provided control and
> guidance on the lay-off decision.

---

[32]   Excluded work divisions were maintenance, supplies, warehouse, quality control,
housekeeping, and sanitation. As previously noted, four clerical positions and one nurse's position
were considered for elimination, as well as a reduction in hours for some remaining clerical
positions.

*Plaintiffs' Brief,* p. 91.

*Discussion and conclusions:* The supervisor whose recommended lay-off was vetoed by Dade was Martha Dupree, a black woman. This veto is one instance where Dade exercised his authority to reject recommendations.  His right to veto recommendations does not indicate control over the committee's decision as to whom to recommend for lay-offs.  It does indicate that Dade was not looking at the color of his employees' skin.  The placement of several of the retained supervisors is different from deciding who should be laid off.  The actions of some of the superintendents show that they did not consider themselves as merely tools or rubber stamps of Hatley. Leath expressed "some angst over the job she and the rest of the committee were given, apparently after the committee had made its recommendation, that some positions were moved." *Leath Deposition,* p. 93; *Plaintiffs' Brief,* p. 90.[33] The plaintiffs' assertion that Johnson spoke out on behalf of Bullock shows that Johnson took the committee's job seriously. When Hatley was asked if he expected Dade and King to participate in the lay-off discussions, he replied,  "only if necessary.  My directions to Steve and Randy were to let the four superintendents make the determinations if possible." *Hatley Deposition,* p. 146. The plaintiffs also cite Tanya Weatherspoon's affidavit in support of their assertion Dade "provided guidance to the committee."  This affidavit does not mention Steve Dade.  Weatherspoon stated that "the

---

[33] Leath explained that Arlene Wyatt was brought to day shift and Gary Grimes was put on night shift.

shift managers had an opinion like everyone else. There was no undue pressure from them. They allowed superintendents to make team selections." The defendant does not dispute that seniority was not the test for determining which supervisors would be laid off; Hatley's instructions were for them to retain those supervisors who could best reverse the misfortunes of the Gadsden plant. The fact that *black* superintendents recommended that Bullock, Tanner, and Thornton be laid off is also a proper consideration. *See Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 999 (1988). As to the plaintiffs' statement that "Ms. Weatherspoon's notes reveal [Hatley] literally threatened them with their jobs if they essentially failed to do the right thing," those notes reveal that in his thirty-minute talk to the committee before they began their work Hatley "talked about what was expected of the chosen 4 superintendents. He stated that if our job performance wasn't acceptable disciplinary action would be taken. We were told that from the list of front line supervisors choose people who could and would help get the plant up and running in a profitable, efficient manner." Thus, the well-being of the superintendents' own positions with Tyson were implicated in the plant's economic turn-around. The superintendents' own self-interests dictated that they retain those supervisors who would most likely accomplish the goals of the RIF. The plaintiffs put a negative light on Hatley's telling the committee to use seniority only if they were confronted with equal performance; however this statement indicates that performance was Hatley's polestar. It was pointed out in the discussion of

Ash and Hithon's demotion claims that there was no evidence that the maintenance and accounting departments were all white. As to Hatley cutting pay roll twenty percent instead of the mandated five percent, it should be remembered that the Gadsden plant, more than any other plant, needed streamlining and economizing.

The plaintiffs' argument that there was discrimination in the lay-offs amounts to a contention that Hatley, Dade, and King engaged in complicated maneuvers in order to lay-off Bullock, Tanner, Thornton, and Davenport for discriminatory reasons. It is concluded that there is insufficient evidence to support a finding that Bullock, Tanner, or Thornton were laid off because they were "outspoken blacks" or that Davenport was laid off because she was dating a black man.[34]

## TANNER'S REQUEST FOR TRANSFER TO FIRST SHIFT

Travis Tanner was  portion control supervisor, second shift. He requested to be transferred to portion control supervisor, first shift. He states that the first shift would have been more convenient for him for unspecified personal reasons. Joey Broom, a white male, was transferred in from the Blountsville plant and given the position. Tanner states that this was the first time such a transfer had taken place in the Gadsden facility, and that the custom was to give a first shift opening to the person on the second shift if he wanted

---

[34] Davenport's gender discrimination claim will be discussed in a separate section.

it. Tanner also states that he had approximately one and one-half to two years' experience and more seniority than Broom.  The defendant contends that not granting Tanner's request for transfer was not an adverse action, for transfer to the first shift would have actually resulted in less money for Tanner. The defendant cites a case decided by a federal judge in this district.  Three cases addressing transfers of one nature or another were cited in that memorandum opinion: *Spring v. Sheboygan Area School District; Collins v. State of Illinois*; and *Darnell v. Campbell County Fiscal Court.*

In *Spring v. Sheboygan Area School District*, 865 F.2d 883 (7th Cir. 1989), it was noted that in order to state a discrimination claim a plaintiff must prove a *materially* adverse change in the terms or conditions of his employment. This case held as a matter of law that transferring an elementary school principal to a dual principalship of two other elementary schools was not a materially adverse change of the terms or conditions of her employment. This decision was reached after a consideration of various negatives and positives of the transfer. The court in *Collins v. State of Illinois*, 830 F.2d 692 (7th Cir. 1987), after stating that changes in job responsibilities and accouterments of employment alone can be sufficient to establish adverse change in the terms and conditions of employment,  noted that other courts have found adverse job impact in lateral transfers which did not result in a reduction of pay or benefits where:

> there was no reduction in salary or benefits, in an employer's moving an employee's office to an undesirable location, transferring an employee to an isolated corner of

the workplace, and requiring an employee to relocate her personal files while forbidding her to use the firm's stationary and support services.

*Collins,* 830 F.2d at 703. Generally, however, "[b]arring unusual circumstances . . . a transfer at no loss of title, pay, or benefits does not amount to a constructive discharge or adverse employment action." *Darnell v. Campbell County Fiscal Court,* 731 F. Supp. 1309, 1313 (E.D. Ky. 1990).[35] "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir. 1996). An adverse action must be material to be actionable. "Otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Id.* (*quoting Williams v. Bristol-Meyers Squibb Co.,* 85 F.3d 270, 274 (7th Cir. 1996). "A negative evaluation cannot, by itself, constitute an actionable adverse action." *Id.* at 442-43. *Accord Mattern v. Eastman Kodak Co,* 104 F.3d 702, 708 (5th Cir. 1997) (verbal threat of being fired, reprimanded, missed pay increase, and being placed on "final warning" do not constitute adverse employment actions because of their lack of consequence). The plaintiff alleged discrimination in *Reilly v. Metro-North Commuter Railroad Company,* No. 93 Civ. 7317 (PKL), 1996 WL 665620 (S.D.N.Y. November 15, 1996) when her work schedule was

---

[35]  "A constructive discharge must be based on objective criteria that would create intolerable conditions that a reasonable person could not be expected to bear. . . .  A transfer involving loss of prestige or an objectively demeaning change of working conditions — such as removal from a private — can amount to a constructive discharge. . . . Subjective considerations are insufficient." *Darnell v. Campbell County Fiscal Court,* 731 F. Supp. at 1313.

changed to the midnight shift. The court stated that it was not clear that transferring an employee to the midnight shift can be deemed an adverse employment when her salary or grade level was unaffected, for Title VII does not exist to protect employees' preferences. "It is questionable whether, as a matter of law, a schedule change having no impact on the terms of employment such as pay and grade-level represents a *materially adverse* action." *Id.* at 13. In *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 n. 6. (9th Cir. 1994), the Ninth Circuit questioned the existence of adverse employment action where an employee was transferred to a different work shift but did not suffer any material detriment.

Tyson further contends that if the court finds that the failure to transfer the plaintiff to the first shift was an adverse action, there is no evidence that the request was denied because Tanner is black. The defendant states that it is merely Tanner's opinion that he was more qualified than and senior to Broom. Additionally, Shelia Duckett, "a seventeen-year veteran who never complained of discrimination, also had to wait an extended period of time to obtain a desired shift change because of supervisor shortages at about the same time." *Defendant's Brief,* p. 69.[36] Tyson explains that in September of 1997, all debone supervisors, first shift, either resigned or were terminated. Plant manager Murphy rejected Tanner's request for one of those positions, and hired two former supervisors from another

---

[36] Tyson states that Tanner "assumes" that Broom was given first shift because he was friends with Hatley, and cites pages fifty-four to fifty-five of Tanner's Deposition. This was not Tanner's testimony.

chicken processor, Marshall-Durbin. Tanner admitted, however, that Murphy indicated

he needed at least one experienced debone supervisor on the second shift, and Murphy

testified that it was intended that the two new supervisors would be reassigned to the

second shift after their orientation was completed and their abilities demonstrated, at

which time Tanner would be transferred to first shift.

It is held that the failure to transfer Tanner was not a materially adverse action.

Further, even if it were, the evidence is insufficient to sustain a finding that the defendant's

explanations were pretextual.


## DISPARATE IMPACT CLAIMS

The plaintiffs contend that even if there were no intent to discriminate, Gadsden's

decisions had a disparate impact on them as black persons.  There is no evidence which

could support such a claim. If anything, the statistics previously stated establish the

opposite.


## RETALIATION CLAIMS

### Law

Title VII provides:

[I]t shall be an unlawful employment practice for an employer to discriminate
against any of his employees or applicants for employment . . . because he has

opposed any practice made unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliatory discrimination, an employee must prove that he (1) engaged in protected conduct; that is, opposition to Title VII discrimination or participation in a Title VII proceeding,  (2) some adverse action was taken against him by his employer at the same time as or subsequent to the time of the employee's protected conduct, and (3) there is a causal connection between the employee's protected conduct and the employer's adverse action.  *Morgan v. City of Jasper,* 959 F.2d 1542, 1547 (11th Cir. 1992).  The amount of time which has passed between the protected activity and the alleged retaliation is also pertinent.  *See Earley v. Champion International, Corp.,* 907 F.2d 1077, 1082-83 (11th Cir. 1990).

The Fifth Circuit states the "but for" test:

In a retaliation case, . . . the ultimate determination required for the plaintiff to succeed is different from a disparate treatment case.   The ultimate determination is whether or not retaliation for filing a charge under Title VII was a "but for" cause of the adverse employment decision.  "[W]hether or not there were other reasons for the employer's action, the employee will prevail only by proving that 'but for' the protected activity she would not have been subjected to the action of which she claims.  If the employee does not bear that burden of persuasion, she may not prevail."

*McDaniel v.  Temple Independent School Dist.,* 770 F.2d 1340, 1346 (5th Cir.  1985).

Robin Davenport

Davenport states that after Dade learned she was dating a black man, he, among other things, watched her more carefully, gave her more duties, and laid her off. The defendant points out that dating a black man is not protected activity. The plaintiff has presented no authority that it is. Because a white woman's dating a black man is not protected activity, allegations of retaliation based on that activity will not lie. Robin Davenport also filed an EEOC charge in January, 1996, along with all the other plaintiffs, although the specific claims in the complaint are unknown. Because Davenport states that the alleged retaliation occurred after she filed her EEOC complaint and after the lawsuit, Davenport's alleged instances of retaliation will be stated.

*Extra work*

    1. Number of pounds going through the freezer:  After Davenport filed her EEOC claim, Plant Manager Rice called her to return to work as a supervisor.[37] Davenport states that supervisors in front of the freezer were in a better position to provide information concerning the number of pounds which went through than the supervisor who worked behind the freezer. Davenport, however, even though she worked behind the freezer, was required to provide that information. In response, the defendant states that the supervisors at the front end of the freezer would not supply the information needed and consequently Davenport was asked for the data recorded at her end. The defendant

---

[37] Rice replaced Hatley, and Rice was later replaced by Murphy.

points out that Davenport admitted that her supervisors became upset when the supervisors at the front end of the freezer failed to keep up with the statistics and that they would reprimand the front end supervisors for that failure.

2. Number of pounds of chicken leaving freezer versus number of pounds paid for by customer: Davenport's shift manager, Jimmy Cawley, asked her to use a form he devised to record the number of pounds of chicken in the boxes leaving the freezer with the number of pounds of chicken being paid for by Tyson's customers. The purpose of the form was to determine whether customers were getting chicken for which they were not paying. Davenport admits that this statistic would be useful to management, and her only complaint is that she was given the form two weeks earlier than her counterpart on another shift. This action seems of small moment. Further, Tyson points out that Davenport's co-workers who had not filed discrimination complaints had to perform the tasks about which she complains. It is also noted that those persons in management who are named by the plaintiff as the persons responsible for this alleged retaliation were not involved in the matters about which Davenport filed an EEOC complaint; neither has it been shown that they were even aware of Davenport's alleged protected activities. *See Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 259 (8th Cir. 1996) (no evidence that the individuals responsible for the alleged retaliatory harassment were even aware of the EEOC complaint and thus no evidence connecting the protected activity and the alleged retaliatory acts).

*Malfunctioning equipment:* In October of 1997, Davenport was the master pack supervisor, second shift, while Bernard Loftis held that job on the first shift. The packaging of chicken in ziploc bags was automatically done by machine. That machine, however, broke. Plant Manager Murphy attempted to have the machine repaired, apparently without success. Davenport asserts that the factory representative made recommendations of things to do in order to repair the equipment.[38] The defendant, however, according to Davenport, did not follow those recommendations. Instead, Davenport was instructed to weigh each bag of chicken manually. Apparently as a result of this instruction, Davenport asked Murphy and Blake for extra workers. Davenport apparently contends that because the machine was not repaired and because she was not given extra workers there was a recall, and that, because of that recall, she was terminated. Davenport states that Murphy's analysis of the re-weighing data might not have considered the potential for differences caused by "glaze tarc."

According to the defendant, there is more to the story. Because of the malfunctioning equipment, an incorrect number of chickens was packed into ziploc bags and four truckloads of chicken were returned by Cub Foods. Murphy and Shift Manager Darron Lockhart ordered the use of additional scales. In late September of 1997, another large shipment was returned by the same customer because the packages were

---

[38] What those recommendations were is not known.

underweight. As a result, Tyson was in danger of losing an important customer. Davenport had participated in re-weighing, or supervised the re-weighing, of these packages. Murphy analyzed the data provided by Davenport's group and determined that supervision of the re-weighing process had broken down. As a result, Davenport and Loftis were terminated. It is noted that Loftis, although a black man, was not involved in any of the wrongdoings alleged in this lawsuit. It is additionally noted that Superintendents James Blake and Tanya Weatherspoon, the former of whom had not filed an EEOC complaint and is not a plaintiff in this lawsuit, were demoted to supervisor positions as a result of the Cub Food incidents. Also, Davenport's assertion concerning "glaze tarc" indicates that the decision to terminate Davenport was based on performance.[39]

*Extra hours*: The defendant acknowledges that Davenport worked extra hours, but points out that she stated that no management official ordered her to do so. Apparently, the extra hours were caused by increases in the work time of her hourly subordinates.

### John Hithon

Hithon states that he also suffered various acts of retaliation as a result of his having filed an EEOC complaint in January, 1996.

---

[39] Murphy states that the analysis *did* include consideration of glaze tarc.

*Negative evaluation:* Hithon states that he was given a negative evaluation by Dade after the EEOC charges were filed in 1996. The defendant did not address this statement. However, it does not appear that Hithon suffered any adverse consequences.

*No interview for anther shift manager job*: Hithon states that in March, 1996, he asked Hatley if he could be interviewed for the shift manager's job which became open when Dade left.[40] Hatley told Hithon that he needed a college degree and would not interview him. Hithon then told Mark Waller, complex manager, that he wanted an interview. Although Waller told Hithon he could have an interview, Hithon was not interviewed.

Hatley's statement of the necessity of a college education is nothing new. He told Ash and Hithon when they wanted to become shift managers that they had to have a college education. Thus, Hatley's refusing Hithon an interview on the same ground cannot be considered retaliation.[41] As to Complex Manager Waller, the only evidence is that Waller told the plaintiff that he would be interviewed and Hatley did not give him an interview. This is insufficient to make a claim of retaliation against Waller. Moreover, it has not been shown that Waller had anything to do with or even knew about Hithon's protected activities.

---

[40] Hithon was promoted in 1996 to superintendent of first processing, which was his old superintendent position.

[41] In his promotion claim, *supra,* Hithon is using Hatley's college requirement statement as evidence of intentional race discrimination.

*No raise:* Hithon complains that he did not receive a raise in June, 1996. The defendant states that Hithon (and Ash) were not given raises because their salaries had not been reduced when they were demoted to supervisor. Blake told Hithon that he was already making more than a supervisor. It seems clear that the failure to give a raise under these circumstances cannot be deemed retaliation.

*No bonus*: Hithon states that in 1997, he did not receive a bonus even though his supervisors did. The defendant states that Plant Manager Murphy simply thought Hithon's performance in 1997 did not merit a bonus. Additionally, the plaintiff admitted that he did not get a bonus "because of the poor efficiencies" of matters under his supervision. The defendant points out that other managers received bonuses, including *Ash and Bullock*, who, of course, had made discrimination charges against Hatley and Tyson and filed this lawsuit. It is further noted that Hithon's wife also received a bonus. Finally, again, it has not been shown that Murphy knew about Hithon's protected activities. The failure to give Hithon a bonus under these circumstances cannot constitute retaliation.

*Rejected recommendations*

1. Part time workers: Hithon complains that certain of his recommendations were ignored. In response, the defendant states that Hithon has testified only to two recommendations. As to the first, the defendant explains that between September of 1997 and December of 1997, Plant Manager Murphy and Shift Manager Darren Lockhart

71

indicated to Hithon that he should eliminate overtime for third shift workers, as the costs in Hithon's area of responsibility were out of line.  Hithon then suggested that a part-time worker assist with setting up the third shift, which would eliminate the need for overtime and other costs which were incurred when a full time worker was used.  Hithon was told that this proposal was not the answer.  Murphy explains that the Gadsden plant was having difficulty recruiting full-time workers, and that it would be even harder to locate someone who would agree to work on a part-time basis without benefits.  It was Murphy's opinion that the overtime problems on Hithon's shift could be dealt with in other ways, such as staggering hours for one or more workers on the shift.  Finally, Tyson asserts that there is no evidence that the terms and conditions of Hithon's employment were adversely affected as a result of the rejection of this idea.

2.  Assignment of new supervisor:  The more senior live receiving supervisor was black, while the new supervisor was white.  Hithon thought this was racially discriminatory, and suggested that a new supervisor be assigned initially to supervise evisceration.  Hithon's supervisor, Darron Lockhart, a black man, stated that the decision where to assign the new supervisor was based on the level of experience of other supervisors on his shift.  It was thought that the new person's training would be enhanced if he were put with the more experienced supervisors.  Further, the defendant correctly

72

points out that this matter had nothing to do with Hithon, as it did not affect the terms or conditions of *his* employment.

"*Write-ups*": Hithon further states that he wanted to "write up" a white employee for an infraction for which he had given a black employee a write up, but was not allowed to do so. The defendant states that the difference between the black supervisor and the white supervisor was that the black supervisor had four months of training at the time, while the white supervisor had only four weeks of training. The plaintiff's evidence does not overcome this explanation so as to make a triable factual issue. Also, the defendant states that this matter had nothing to do with the terms and conditions of Hithon's employment. Without more, such as some adverse consequences suffered by Hithon as a result of not allowing him to "write-up" the white employee, this alleged instance of retaliation is without merit.

*Scrutinized/Written explanations*: Hithon next states that he was "scrutinized" and began receiving numerous memos requesting written explanations when the custom had been to communicate verbally. Hithon does not explain how this was a negative request or how it disadvantaged him.

*Eliminate overtime*: Hithon was told to eliminate overtime, while the maintenance department, which was all white, was not given the same directive. Hithon does not allege that this request was unreasonable and has not demonstrated that his department and the

73

maintenance department are similarly situated. The defendant again asserts that this had nothing to do with the terms and conditions of Hithon's employment.

### Ash

All of Ash's alleged acts of retaliation occurred before he filed his EEOC complaint. According to Ash, the single cause for the various acts of retaliation was a statement Hatley made to Ash shortly after Hatley came to Gadsden. Hatley told Ash that he, Hatley, felt from the day he became plant manager that Ash had a problem with him because of the fact that he and Ash had testified for opposing sides in *Lane v. Tyson,* a race discrimination case. Hatley said that he thought Ash had a problem with *him,* not that he had a problem with Ash. Ash himself testified that he did not know what Hatley meant by this statement. Retaliatory intent cannot be inferred from this vague statement.

*Long-distance telephone calls:* Ash complains that he lost his long distance calling privileges while the only white superintendent, Donna Leath, retained hers. Ash was also told that if he needed to make a long distance call to another Tyson plant, Dade could make the call for him or Ash could use Dade's telephone and make the call himself.

Hatley testified that the reason for the restriction was that there had been excessive long distance calls on the phones of all supervisors and superintendents. For that reason Hatley restricted the toll-call capabilities of everyone except those who had to make

74

frequent long distance calls. Dade told Ash that Leath's warehousing responsibilities required her to call other Tyson plants more often than other superintendents. Ash contends that his job required *him* to make long distance telephone calls. The restriction of long distance privileges was lifted after two weeks. This is another insignificant matter.

*Lost his office:* Ash complains that he was moved out of his office and made to share an office with a second shift superintendent. Dade told Ash that Hatley had decided to convert Ash's office into the USDA's office. Hatley further said that a superintendent did not need an office as big as Ash's. The defendant points out that Ash admits that only he and the second shift processing superintendent were affected; other black superintendents, including plaintiff Hithon, retained their individual offices. Ash has not produced evidence that whites similarly situated were treated differently.

*Supervision of relatives:* Ash states that Hatley told him that Ash's wife, who was an hourly worker, would have to be moved to the first shift because of the personnel rule prohibiting supervision of an employee by a relative. The written "Personnel Policy" states that its purpose is "[t]o ensure the fair and equal treatment of all our folks." Ash contends that the supervision rule had been enforced only when there was *direct* supervision. Apparently, the plaintiff contends that his supervision of his wife was indirect because, as an hourly worker, she was directly supervised by her supervisor, who in turn answered

75

to Ash the superintendent. Ash named three persons who were allowed to supervise their relatives indirectly.

Although the written policy forbids supervision of one relative by another, and makes no distinction between direct or indirect supervision, the evidence is that this policy is not always followed in cases of indirect supervision. The defendant points out that Tonya Weatherspoon and Bobby Johnson, two of the three superintendents the plaintiff states were allowed to supervise their relatives indirectly, were black. Weatherspoon and Johnson, however, did not file EEOC complaints and are not plaintiffs in this lawsuit. Nevertheless, it cannot be found that this circumstance was materially adverse to the terms and conditions of Ash's employment.

*Negative evaluation*: After Ash's EEOC complaint was filed in January, 1996, Dade gave him a negative written evaluation on February 28, 1996, and discussed it with him in the presence of Hatley. Dade told Ash that his integrity and loyalty were not high enough, under their standards, to be a shift manager. Ash contends that the reference to his "loyalty" could have been only a reference to his 1995 testimony in the *Lane* case; however, it was Hatley who testified in the *Lane* case, and it was Dade who did this evaluation. However, Ash suffered no adverse consequences as a result of the evaluation, as Hatley destroyed the evaluation shortly thereafter.

*Denial of promotion*:  Ash includes "denial of promotion" in his list of retaliatory actions.  It is assumed that the promotion Ash has in mind is the shift manager's position, which has been previously discussed. Ash asserts that he did not get the shift manager job because of both intentional race discrimination and retaliation. However, the protected act would be Ash's testimony in *Lane v. Tyson*.  As previously stated, Hatley's statement that he thought Ash had a problem with him because they testified on opposite sides in *Lane v. Tyson* cannot support a finding of discriminatory intent.

The defendant contends that all of Ash's complaints of retaliation fall because they "(1) demonstrably lack a connection to race, much less his race; (2) affected other employees equally; or (3) were motivated by a desire to adhere to valid company policy. . . .  These complaints are the type of petty or routine complaints that most employees may experience on the job." *Defendant's Brief*, p. 44.

## Bullock

*Laid off*:  In October, 1995, Bullock was made to work live hang, third shift when white supervisors would not.  Bullock complained. In or around October, 1995, Bullock was not interviewed for the waste water treatment supervisor's job, which went to a white female, Toni Sanders.[42] Bullock also complained about this. Bullock asserts that in

---

[42]  Bullock previously claimed that the reason he was not given the job of waste water treatment supervisor was race discrimination. It has already been stated that Toni Sanders

retaliation for these complaints, on January 12, 1996, Hatley told him he was one of the supervisors chosen to be laid off. In support of this assertion, Bullock states that Superintendent Johnson asked that Bullock not be laid off, but Dade and King laid him off anyway. Bullock points out that it was well known that he thought his transfer was unfair and that not granting him an interview for the waste water treatment job was unfair. Bullock also states he told Weatherspoon that he thought he was transferred to third shift because he was black. Bullock went over Hatley's head to complain to Clarence Wilson, complex manager.[43] In its brief, the defendant does not contest this evidence; this claim should proceed.

*Less money as employment supervisor:* After Bullock filed EEOC charges in January 1996, he was offered the position of employment supervisor by Allan Trotter, complex personnel manager in July, 1997. He was, however, paid $1,100.00 a year less than his white female predecessor. The defendant's explanation for this difference in compensation has not been stated. This retaliation claim should go forward.

## Travis Tanner

---

apparently performed some of the duties of waste water treatment supervisor, but she was not given the position of water treatment supervisor or compensated as if she had been. Apparently she was taken off those duties after Bullock filed an EEOC complaint. The contents of that complaint are not known.

[43] According to Bullock's depositional testimony, he did not tell Wilson that he thought the transfer was made because he was black. *Bullock Deposition,* p. 69.

*Retaliation after filing EEOC charge / his old job*: After Tanner was laid off from his job as portion control supervisor, second shift, he filed an EEOC charge. Although Tanner made known his desire to return to his old position, he was not recalled when that job became available in July of 1996, when Hithon was promoted. Rather Tanner was instructed to go to the Heflin facility, which was eighty miles from his home, for an interview. Tanner was apparently offered the Heflin job, but declined because of the long commute. After the Heflin episode, Tanner again asked for his old job, which was still available. Plant manager Keith Riley, however, spoke to Tanner about the least desirable job on the least desirable shift — live hang, third shift.[44] In the summer of 1996, Tanner's old job was finally awarded to a white female, Ede Wildman. Two weeks later, Tanner interviewed and got the job of deboning supervisor, second shift.

Tanner asserts retaliation in Riley's failure to give him back his old position of portion control supervisor, second shift. He states that Ede Wideman, the white female who was given the job, had "countless" disciplinary write-ups, whereas Tanner did not have any disciplinary write-ups. *Plaintiffs' Brief*, p. 110. Tanner's file did, however, show that he had filed an EEOC charge; this, the plaintiff contends, was the reason he did not get his old job back.

---

[44] Tanner said that he had no experience in evisceration, first processor, live hang.

In response, Tyson states that Tanner was first offered the job of live hang supervisor, third shift. When Tanner asked why he could not have his previous job of portion control supervisor, first shift, he was offered debone supervisor, second shift, which Tanner accepted. Tyson contends that there is no evidence that the live hang supervisor, third shift, was a position Tanner did not want and would not accept, and Tanner accepted the job next offered him. Although Tanner does not state the source of his statements about Ede Wideman, and the plaintiff does not state that Riley knew of Tanner's EEOC complaint, the defendant has not given a reason for not offering Tanner, and perhaps not even considering him for, his old position. This alleged act of retaliation should proceed.

*Retaliation after deposition*

1. Additional duties: Tanner states that within months after he returned to Tyson, he was running, by himself, the entire department, which included 150 workers. Although Tanner finally received help in deboning, another department — Boston Markets — was added to his duties, and later, even more duties — wog rehang and leg quarters — were added. Tanner states that on the second shift he had young workers with no experience and a high turnover rate, which in turn required additional supervision from him.[45]

---

[45] Robin Davenport's duties, Tanner states, were also expanded.

The defendant states that it is the very inexperience and high turnover of workers of which Tanner speaks which explain the necessity of the conditions about which Tanner complains. Plant manager Randy Murphy states that the company was experiencing an unacceptably high turnover rate among supervisors, and he partially blames that problem on a tight labor market in the Gadsden area. The defendant points out that Tanner admitted that he was aware of the difficulty Tyson was experiencing attracting qualified candidates for supervisor jobs at the time. Tyson further explains that, beginning the second half of 1997, Tanner and Mary Waters, a white female supervisor, were collectively responsible for 115 to 120 hourly employees on the deboning lines, third shift. The defendant points out Tanner's statement that he interpreted Waters' comments that she was tired of the "crap" as referring to excessive hours of work and a shortage of supervisors and hourly workers. Tanner also testified that he felt the same as Waters.[46]

Plant Manager Murphy testified that Tyson was making a great effort to find qualified supervisors. Murphy additionally stated that Tanner was indeed given additional duties, including assignment to the Boston Market room, because a supervisor with experience and knowledge of the workers on second shift was needed. When additional supervisors were finally hired to help on the deboning line, second shift, Tanner's duties were to be reduced to include supervision of only a portion of the

---

[46] In late 1997, Waters resigned.

81

deboning line, the Boston Market room, a portion of leg quarters, and the "wog rehang room." The defendant did deny Tanner's request for a raise, as it denied a white supervisor's request for a raise who had made no charge of discrimination. The white supervisor sought a raise because of a temporary increase in *his* supervisory duties. Murphy stated that all experienced supervisors had their responsibilities increased during this time. There is insufficient evidence to support a finding that "but for" the protected activity the alleged retaliation would not have occurred.

2. Recommendations rejected: Tanner's recommendations to make better use of existing supervisors and to distribute the work more evenly were rejected.

3. Late $25.00 check: In July of 1997, managers were due to receive yearly performance appraisals and salary increases. Tanner states that he did not receive his bonus check because it was held by Jimmy Cauley, Shift Manager, in his desk drawer, though every other worker in the plant got their checks. Tanner inquired in writing about the whereabouts of his check.

The defendant responds that the Gadsden plant failed to report the salary increases on time, and therefore separate checks had to be cut for each supervisor to cover their salary increases for the first pay period.[47] As soon as Cawley got Tanner's letter of inquiry, he immediately gave Tanner the check and apologized for the delay, explaining that he had

---

[47] It does not matter whether the check was a bonus check or reflected a raise.

been very busy and simply forgotten to give it to him. Cawley had nothing to do with the matters about which Tanner filed his EEOC complaint. Again, there is no evidence that this actor was even aware of this plaintiff's EEOC charge or this lawsuit.

4. Transfer refused: Tanner complains that he was denied transfer to a more desirable shift. The relevant facts have previously been stated in Tanner's claim that he was discriminated against when his request for a transfer to first shift was denied, *supra*.

5. Two write-ups: On July 31, 1997, Tanner was given the first "written warning" of his career at Tyson. An employee under Tanner's supervision had allowed a condemned barrel of chicken to touch the conveyor belt used to process chicken breasts. The plaintiff contends that the write-up was retaliatory because another supervisor, Cruz Costello, had the same thing occur and he was not given a written warning. Shift Manager Lockhart explained that Costello was still in training at the time and trainees are not held to as strict a standard as experienced supervisors. Thus, Tanner and Costello were not similarly situated.

The second write-up occurred on September 12, 1997. Tanner had allowed chicken packages to leave the Boston Market room with the wrong "kill date" on the label. Tanner responded in writing to the warning, explaining the check system that he had put into place to prevent such mistakes. The written warning was then "reduced by plant management to a memorandum of understanding." *Defendant's Brief* at 75. The defendant

points out that Tanner merely "assumed" that when that same mistake occurred with another supervisor, Rafael Soto, Soto was not given a written warning. The defendant states that Tanner's assumption is not admissible evidence. *Id.*[48]

## Conclusions

Some of the actions complained of by these plaintiffs were ordinary business decisions, some were merely small inconveniences, some applied equally to persons outside the pertinent protected class, some were without adverse consequences, some of the plaintiffs' contentions are based on speculation, at least one act was unintentional, and in some alleged retaliatory situations there is a lack of evidence that the person who committed the act in question had been involved in or even knew about the relevant protected activity. If evidence of individual acts of retaliation falls short of making a triable issue of retaliatory conduct, the sum of such evidence cannot do so. *See E.E.O.C. v. Texas Instruments, Inc.*, 100 F.3d 1173, 1186-87 (5th Cir. 1996) ("'evidence' that does not imply pretext taken alone does not do so when cumulated"); *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir. 1990) ("the sum of four nondiscriminatory episodes does not support [a] case anymore than viewing the four episodes separately").

---

[48] Tanner resigned on October 13, 1997.

It is concluded that all of the alleged acts of retaliation are without merit as a matter of law, except Bullock's claim that he was retaliated against for filing EEOC charges when he was paid $1100.00 less per year than his white female predecessor, Bullock's claim that he was retaliated against by being laid off, and Tanner's claim that he was retaliated against when Riley did not give him back his old position of portion control supervisor, second shift.

## FRAUDULENT INDUCEMENT OF EMPLOYMENT

In the amended complaint, Count VIII, Vivian Thornton raises a fraudulent inducement of employment claim. She apparently alleges that Hatley told her that she was going to be laid off, and, upon her request, Hatley gave her a "decision-making leave." While on this leave, Hatley told Thornton to stay at Gadsden, for he had a way for her to stay on the first shift in that plant. He also advised her that if she took an hourly-wage job it would be harder for her to return to management. Relying on this representation, Thornton turned down an hourly job at Tyson, Oxford, and returned to Gadsden on January 2, 1996, only to be laid off indefinitely on January 10, 1996. Thornton alleges that because of her probationary status she was "selected" even before the committee of superintendents met to consider lay-offs. She also states that she was selected for lay-off

85

because she was black and because while on leave she had complained to Mark Waller, the complex manager, about a certain lack of training.

The defendant contends that the plaintiff has no cause of action because of the "employee-at-will" doctrine. The plaintiff cites *Shaddix v. United Ins. Co. of America*, 678 So.2d 1097 (Ala. Civ. App. 1995). The plaintiff in that case alleged that he continued his employment based on certain representations made by the employer. It was held that the employee-at-will doctrine does not apply where an employee *continues* working for his employer because of the company's promise regarding its future conduct. The court set out the elements of promissory fraud:

(1) that the defendant made a false representation of a material fact; (2) that the false representation was relied upon by the plaintiff; (3) that the plaintiff was damaged as a proximate result of the reliance; (4) that the representation was made with a *present intent to deceive*; and (5) that when the representation was made the defendant intended not to perform in accordance with it.

*Id.* at 1099.

The plaintiff also cites *Smith v. Reynolds Metals Co.*, 497 So.2d 93 (Ala. 1986), which discusses innocent misrepresentation. In this case, the plaintiff sought summer employment which was available to the children of employees who worked at a particular plant. The plaintiff's father worked for the defendant, but not at the plant offering summer employment. Through simple mistake, the plaintiff was given a job to which she was not entitled. When the mistake was discovered, she was terminated. The plaintiff had allegedly *turned down* other employment because of the defendant's promise of a job. The

court held that summary judgment for the employer was improper, stating that the plaintiff, even though an employee-at-will, had a cause of action under § 6-5-101, *Code of Alabama*, 1975.

Tyson cites *Burrell v. Carraway Methodist Hospitals*, 607 So.2d 193 (Ala. 1992). In this case as well, the plaintiff was an employee-at-will. Burrell's employment was terminated, and he contended that the reasons for his termination were invalid. The court held against him, stating:

> In *Salter v. Alfa Ins. Co.*, 561 So.2d 1050 (Ala. 1990), this court held that the showing of a loss of employment is legally inadequate to show the element of damage in a fraud claim by an at-will employee against his or her employer. We reasoned that because such an employee is terminable at will, even for a malicious reason, there can be no legally compensable injury resulting from the employer's terminating the employment.

*Id.* at 196. Whether or not the reasons were invalid did not matter because Burrell was an employee-at-will.

Thornton's situation is factually different from the *Burrell* case. Burrell was *discharged*. Thornton, as the plaintiff in *Shaddix v. United Ins. Co.*, was induced to *continue* her employment. Thornton, as in *Smith v. Reynolds Metal Co.*, asserts, among other things, innocent misrepresentation. Summary judgment is due to be denied on this claim.

87

## Davenport's Gender Discrimination Claim

Davenport also contends that she was "replaced by a male who had less seniority than she did." *Plaintiffs' Brief*, p. 110. In her discussion of this claim, Davenport does not identify the male in question or explain the circumstances of the "replacement."[49] Nevertheless, the facts will be discussed.

The court believes the male replacement Davenport has in mind is Scott Batson. Tyson states that Davenport's supervisor had the opinion that Davenport was lazy, her heart was not in her work, she had a negative attitude, she had "burned out," and she stayed in the office rather than on the production floor where she should have been. Weatherspoon states in her affidavit that "[w]hen Weatherspoon was a line supervisor she would get aggravated because Davenport stayed in the office too much. In Blake's affidavit it is  stated that Davenport did paperwork for other supervisors in order to stay off the floor.  Davenport's response to those statements of Tyson is that there is evidence that Blake counseled her even though he was aware that she was doing paperwork for a number of supervisors and was working on a special project for Hatley. The fact of any such counseling cannot show that Tyson's reasons are pretextual.  Moreover, Tyson points out that there were at least as many women supervisors as men supervisors who had less

---

[49] Davenport is not making a termination-of-employment claim.

seniority than Davenport and those women were not laid off. This claim is due to be dismissed.

## SUMMARY

The plaintiffs' motion to strike the affidavit of Randy Murphy on the ground that Murphy was not working at Tyson, Gadsden when the losses he discusses were incurred is due to be denied. The defendant's summary judgment motion is due to be denied in part and granted in part. It is due to be denied as to Ash's promotion discrimination claim; Hithon's promotion discrimination claim; Bullock's claim that he was retaliated against for filing EEOC charges when he was paid $1100.00 less per year than his white female predecessor and his claim that he was retaliated against by being laid off; Tanner's claim that he was retaliated against when Riley did not give him back his old position of portion control supervisor, second shift; and Thornton's claim of fraudulent inducement of employment. The defendant's motion for summary judgment as to all other claims, specified or not, is due to be granted and those claims dismissed.[50] An appropriate order will be entered contemporaneously with this Memorandum of Opinion.

DONE this _17th_ day of November, 1999.

Robert R. Armstrong, Jr.
United States Magistrate Judge

---

[50] It is unlikely that a motion to reconsider would be productive.