IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| ANTHONY ASH, EDDIE BULLOCK, ROBIN DAVENPORT, JOHN HITHON, TRAVIS TANNER, and VIVIAN THORNTON, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) CIVIL ACTION NO. 96-RRA-3257-M ) ) |
| TYSON FOODS, INC., a corporation, and THOMAS HATLEY, an individual, | ) ) ) |
| Defendants. | ) |

ENTERED
MAR 26 2004

## MEMORANDUM OF DECISION

The jury found in favor of the remaining plaintiffs, Anthony Ash and John Hithon, on their claims of promotion discrimination, and returned identical awards of compensatory damages in the amount of $250,000.00, and punitive damages in the amount of $1,500,000.00.[1] Before the court is the defendant's Rule 50 motion for judgment as a matter of law on the plaintiffs' discrimination claims, their claims for compensatory damages, and their claims for punitive damages (ct. doc. 247). The defendant filed a memorandum of law in support thereof (ct. doc. 254). The plaintiffs filed their opposition (ct. doc. 259) and a supporting brief (ct. doc. 260), to which the defendant filed a reply (ct. doc. 265). At oral

---

[1] The question of back-pay was reserved for a bench trial, and the court reserved that matter until ruling on the current motion. The claims of Hithon and Ash in question are the only remaining claims, as the other claims remaining after the court's ruling on the defendants' motion for summary judgment have been dismissed. Defendant Hatley has been dismissed from the case.

argument, the defendant filed a further response addressing the plaintiffs' particular assertions of pretext (ct. doc. 297).

The court has the duty to grant the defendant's motion and dismiss plaintiffs Hithon's and Ash's discrimination claims if the evidence is insufficient to sustain findings that the plaintiffs were passed over for promotion to shift manager because of their race. Although it is the trial evidence which is under consideration, the standard is the same as if the court were considering a motion for summary judgment. The trial transcript allows the evidence presented to the jury to be carefully considered.

### Reasons Given by Hatley for Selecting King and Dade over Hithon

Hatley did not base his promotion decisions on the written qualifications for shift manager. Hatley testified that he based his decisions on these factors: experience in the poultry industry in a successful plant; leadership and organizational skills; experience in more than one plant; having a college degree; and, as the primary consideration, Hatley's belief that it would be better to have as shift managers persons who were not associated with the badly-performing Gadsden facility. With respect to the latter, Hatley strongly relied on what he was told by others (references) in assessing current managers. This was explained by Hatley, in part, when he testified to what he told an applicant who did not get the job:

> Q. Did you tell him very clearly what the primary reason he didn't get the job was?
>
> A. I most certainly did.

| | |
|---|---|
| Q. | And what was that? What did you tell him? |
| A. | Again, that we had poor performance at Gadsden. We had a group of managers there that admittedly, no issue that they had been in the business for a long time. You call that knowledge, call that experience, whatever. But the numbers were bad. We were losing money.<br>And, the huge question mark in my mind is what part did their leadership play in the poor performance and, more importantly, why hadn't the leadership help change that. |
| Q. | Now, how long had you had to observe personally the performance of those two guys? |
| A. | Not very long. Again, these two shift managers - - |
| Q. | Did you do anything to double check to be sure that maybe in spite of their association, that there might be - - you know, that you shouldn't give so much weight to that? |
| A. | Well, again, John Pittard worked with these guys for a long period of time. As a matter of fact, I think, it's also noted. And I asked him. And my concern - - the question mark there based on John's reference was not erased. |

*Trial Transcript*, pp. 439-40.

### Ash Was Not Considered

Hatley testified that Ash told him at the beginning that he did not think he was ready to be a shift manager, and, therefore, did not consider Ash for either shift manager opening. Ash's evidence, however, is that he told Hatley that he wanted to be considered for the job. As the non-moving party, Ash's version of the evidence must be taken as true. However, it is

Ash's position, and the evidence is uncontroverted, that Hatley did not consider Ash for either shift manager opening.[2]  Hatley testified:

> THE COURT: Did you say that Ash did not come to you and tell you that he wanted the second slot that came open?
>
> THE WITNESS: He did not.
>
> THE COURT: Did you consider him even though he didn't come to you and say that? Did you still consider him?
>
> THE WITNESS: Sir, after he told me in the office that he was not ready for the shift manager's position, I didn't consider him beyond that.

*Trial Transcript*, p. 456. Why did Hatley not consider Ash? The defendant contends that Hatley simply acted on Ash's statement that he was not ready for the job, while Ash asserts discrimination.

## Law of Pretext

Because it is believed that the evidence supports a finding that the plaintiffs were qualified to be shift managers, and because Hatley offered legitimate, non-discriminatory reasons — the factors previously enumerated that Hatley stated he based his decisions on — for selecting King and Dade, who are both white, Hithon must show that these considerations were pretextual. It is incumbent on a plaintiff to show pretext as to each and every reason given by the decision-maker for taking the action complained of. In the context of pretext, Hatley's considerations in selecting King and Dade should be considered as one "reason," as

---

[2]Nevertheless, the defendant compares and discusses Ash's qualifications.

Hatley considered them together and overall, not separately. Together, they are deemed "qualifications."

> Pretext "means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995). The question is not whether the employer properly evaluated the competing applicants, but whether the employer's reason for choosing one candidate over the other was honest. *Brill v. Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir.1997). " 'Pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir.2001) (internal citations omitted). Thus, even if IBP's reasons for selecting Harris over Millbrook were "mistaken, ill considered or foolish, so long as [the employer] honestly believed those reasons, pretext has not been shown." Jordan v. Summers, 205 F.3d 337, 343 (7th Cir.2000).

*Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002). The court is "not in the business of adjudging whether employment decisions are prudent or fair. Instead, [its] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.2d 1354, 1361 (11th Cir. 1999). A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by [improper discriminatory reasons]. *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000). Evidence of pretext might not be enough to prove intentional discrimination:

> [I]f the plaintiff proves at trial that the defendant's proffered reason for its employment decision was false, i.e., pretextual, that is "one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* But "[i]t is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* Thus, as the Supreme Court in *Reeves* stressed, the existence of the prima facie case, coupled with evidence of pretext, is not always enough to satisfy the plaintiff's burden of proving intentional discrimination. Id. at 146-47, 120 S.Ct. 2097 ("This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be

> instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.").
>
> Applying *Reeves*, we must first consider whether Millbrook presented sufficient evidence of pretext--not because that is dispositive, but because if IBP's asserted justification for selecting Harris were pretextual, that could constitute circumstantial evidence that IBP intentionally discriminated against Millbrook. From there, we review the record as a whole to determine whether the evidence in its entirety supports a reasonable inference of race discrimination. *Id.* at 148, 120 S.Ct. 2097.

*Millbrook v. IBP, Inc.*, 280 F.3d at 1174. "[A]n employer would be entitled to judgment as a matter of law ... if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. at 148. Moreover, the plaintiffs must present evidence that Hatley lied. It is not enough for the factfinder simply to disbelieve Hatley's reasons. "[W]ithout proof of a lie [as to what the employer believed] no inference of discriminatory motive can be drawn." *Millbrook v. IBP, Inc.*, 280 F. 3d at 1181, *quoting Olsen v. Marshal & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001).

> [T]his standard is consistent with the plaintiff's ultimate burden of proof in discrimination cases. Such a plaintiff cannot get to a "jury if his only 'evidence' had been that defendants' witnesses were not worthy of belief. That would have made it a no-evidence case, and such a case a plaintiff must lose, because he has the burden of proof." *Equal Employment Opportunity Commission v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir.1994) (internal citations omitted). Rather, "to avoid a directed verdict or a JNOV, a plaintiff must do more than merely argue that the jury might have chosen to disbelieve all of the defendant's evidence.... A plaintiff must offer substantial evidence to support the argument." *Perfetti v. First National Bank of Chicago*, 950 F.2d 449, 456 (7th Cir.1991) (internal quotations omitted). Thus, "[a] party cannot meet its burden of proof 'by relying on the hope that the jury will not trust the credibility of the witnesses....' " *Id.* (internal citation omitted). Yet that is exactly what Millbrook attempts; he seeks to justify the jury verdict based on his contention that the jury could

have disbelieved IBP's assertion that it selected Harris because of his superior qualifications. However, without some affirmative evidence calling into question IBP's credibility, Millbrook must lose. *See also, Fischbach*, 86 F.3d at 1183 ("Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates."). Thus, to reconcile this precedent, we must adopt the standard that we have today — that comparative qualifications do not support a finding of pretext – or we would be allowing plaintiffs to reach the jury based solely on a claim that the employer cannot be believed. We have consistently rejected such claims. *See, e.g., Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 926 (7th Cir. 2000) ("It is always possible, of course, that the jury might have disbelieved everything [the employer] said, but we routinely deny summary judgments based on that kind of hope, and consistency requires us also to reject that possibility as a way of saving the jury's verdict.")

*Millbrook v. IBP, Inc.*, 280 F.3d at 1181-82.

The question before the court, then, is whether sufficient evidence was presented at trial to show that Hatley's reason for selecting King and Dade over Hithon was not real, and that his real reason for selecting King and Dade was to deny Hithon promotion because he is black. Ash must show that the evidence is sufficient to find that Hatley's statement that he did not consider Ash because Ash said he was not ready for the job was pretextual.

<u>Plaintiffs' Assertions of Pretext</u>

The plaintiffs claim that there are several pieces of evidence tending to establish pretext and intentional discrimination. These assertions are set out in the plaintiffs' opposition brief, and the court will comment on most of them.

*Qualifications*

Hatley did not base his selections on the written qualifications for shift manager.[3] However, failure to follow policy, without more, is not evidence of discrimination. *Mitchell v. USBI Company*, 186 F.3d 1352, 1355-56 (11th Cir. 1994). In this case, Hatley testified that, although he was aware of Tyson's EEOC policy, he was not aware of the written qualifications for the shift manager position.

Hithon contends that the fact that he was not selected based on his qualifications alone is evidence of pretext. In *Lee v. GTE Florida, Inc.*, 226 F.3d 1249 (11th Cir. 2000), the Eleventh Circuit set out the law concerning claims of discrimination based on qualifications:

> Other circuits have more clearly articulated the evidentiary burden a plaintiff must meet in order to prove pretext by showing she was substantially more qualified than the person promoted. *See Fulton County*, 207 F.3d at 1340. In *Deines*, for example, the Fifth Circuit affirmed the district court's instruction to the jury stating that "disparities in qualifications are not enough in and of themselves to demonstrate

---

[3]Written qualifications

    The written qualifications were set out as follows:

        Education: Requires education beyond high school including special training, vocational school, and/or college course.
        Experience: 3-5 yrs.

        Computer Skills: Requires elementary computer skills. For example, checking electronic mail, entering data into document templates, or creating simple queries.

        Travel: 1-5 trips/yr.

        Special Skills: (none).

    The evidence at trial did not explore whether the applicants met all of these written qualifications.

discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face." 164 F.3d at 280. The court explained that the phrase

> "jump off the page and slap [you] in the face" ... should be understood to mean that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question. This evidentiary standard does not alter the plaintiff's evidentiary burden to prove the fact of intentional discrimination by a preponderance of the evidence. Instead, the standard only describes the character of this particular type of evidence that will be probative of that ultimate fact.

Id. at 280-281.

Lee, 226 F.3d at 1254. The court held that "[n]one of Lee's proffered evidence established that she was more qualified than Hines, let alone so clearly more qualified for the position than Hines that a reasonable juror could infer discriminatory intent from the comparison. Id. at 1255. Also, it is perfectly acceptable for the decision-maker to base his decision on subjective factors as long as they are subject to objective evaluation. *Chapman v. AI Transport*, 229 F.3d 1012, 1034-35 (11th Cir. 2000). "[I]ndeed, for higher level executive and managerial promotions, subjective factors may play a very substantial role." *Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001).

The qualifications of Ash, Hithon, King, and Dade, which are stated in the parties' submissions, are set out generally as follows:

Hithon joined the poultry industry in 1982. His work experience was limited to the Gadsden plant, where, as a superintendent for five years, he was responsible for 500-600 people. Hithon had military experience in the National Guard. He did not have a college degree. Comments on Hithon from "higher-ups" were negative.

Ash joined Tyson in 1980. His only experience outside Gadsden was as a member of a group of 12 employees who trained at the Blountsville plant for three months. In 1995, Ash had been a superintendent for just over one year. He supervised a total of 350 workers. Ash helped start the debone operation at the Gadsden plant, and later helped start the IQF department. He did not have a college degree.

King had worked in two successful Arkansas plants, where he had been a shift manager. He did not have a college degree. He was highly recommended, as will be discussed later.

Dade joined Tyson in 1993. He had held numerous positions at the Boaz plant, including Personnel Manager, Production Superintendent, First and Second Shift Superintendent, and Assistant Plant Manager, some of which positions were held simultaneously. He was transferred to Gadsden as maintenance supervisor in May of 1995. He achieved the rank of Lieutenant Colonel after fourteen years in the United States Marine Corps. In addition to a Bachelor's degree, Dade held a Master's Degree in Management and Human Relations.

It is concluded that even if it could be found that Hithon was more qualified than King or Dade, the disparity would not be so great as to allow a finding of discrimination based on the difference. In fact, the evidence shows that King and Dade were more qualified, considering the emphasis Hatley placed on wanting to bring in new management and the recommendations he received.[4] Whether Ash's qualifications were so superior to Dade or

---

[4]Recommendations are discussed, *infra*, pp. 14-15.

King that Hatley, out of a discriminatory intent, wanted to avoid considering Ash by claiming that Ash told him that he was not ready to be a shift manager, and whether other asserted instances of pretext are evidence of such intent, will be discussed later.

*Other Claimed Evidence of Pretext*

The plaintiffs claim that there is certain evidence which establishes racial animus on the part of Hatley and calls into doubt the reasons he gave for not selecting Hithon or considering Ash. The plaintiffs refer to evidence that Hatley spoke or ate with whites only. Hatley's testimony that Hithon would come by his office and that they would talk in the office and in the break room about Hithon's military experience and the things he would like to do if he were shift manager was undisputed. This evidence is hardly probative of a racial animus. The plaintiffs also point to the testimony that on one occasion Hatley called Hithon "boy," and on two occasions he called Ash "boy." In a production meeting, Hatley said "Hey, boy" as Hithon was walking through the door. *Trial Transcript*, p. 150. In the cafeteria, Hatley said to Ash, "Boy, you think you've got enough starch in those jeans?" *Trial Transcript*, p. 252. Ash's wife told Hatley that her husband was not a boy, and Hatley laughed. Neither Ash nor Hithon complained about the statements. Even if Hatley made these statements, it cannot be found, without more, that they were racial in nature.

The plaintiffs refer to other alleged evidence of discrimination. They state that at the time in question there had never been a black shift manager at the Gadsden plant. This statement is unsupported with statistical evidence sufficient to allow an inference of discrimination, and is, therefore, meaningless. Moreover, Hatley, the sole decision-maker,

had nothing to do with the selection of management personnel before he came to the Gadsden plant.

The plaintiffs claim that the shift manager positions were never posted. Hatley's testimony that he instructed Tyson's resource manager, Ever Higgins, a black woman, to post both openings, is uncontradicted.[5] Certainly the plaintiffs knew of the availability of the jobs, whether they were posted or not. Moreover, Hatley talked to them about the openings.

Hithon testified that he was made sanitation superintendent before July, 1985, given more duties than the white person who previously held that position, and then was ignored when credit for the clean-up was given to Dade. Dade testified that Hatley told him that Purdle had complimented Dade as the person mainly responsible for the effort. Hatley, the decision-maker, had nothing to do with the things about which Hithon complains.

The plaintiffs state that Hatley interviewed Hithon and Blake on the same day he hired King. The apparent implication is that Hatley's interviews with Hithon and Blake, black men, were shams, because King had already been hired. In his testimony, Hatley explained that he simply did not record his interviews with Hithon and Blake at the time they were interviewed, which was before King was hired. The evidence shows that Hatley was not always orderly or punctual in his note taking or the recording of his notes, but that is not evidence of discriminatory intent.

There was evidence that Hatley said he was going to work with the superintendents, one of whom was white, for six months, evaluate them, and then fill the second position.

---

[5] King and Dade testified that they saw the postings.

However, Dade was given the job less than a month later, which was before Hatley had been on board at Gadsden a full six months. The plaintiffs apparently contend that the fact that Hatley did not wait for six months indicates that he did not intend to give them a fair evaluation. It is just as likely, however, that Hatley, who was told to get the situation in Gadsden corrected as soon as possible, who was hesitant to hire a manager at the Gadsden plant as a shift manager, and who received negative recommendations on Hithon, simply decided it was not necessary or prudent to wait six months to make a decision. Hatley, of course, was under no obligation to wait six months or any set amount of time to make his decision. Hatley testified to the pressure he was under:

> Q.  Now, who told you that they wanted you to go in and manage that plant?
>
> A.  Well, I was first contacted by Mark. After the interview process, he said I had been selected for the job.
>
> Q.  What was the potential future of that plant if it continued to lose the kind of money that it was losing the month you took over?
>
> A.  If we continued to lose that kind of money at Gadsden, at some point, Tyson Foods, they would have had to rationalize that plant. They would have had to do a major significant product change or think about closing the plant.
>
> Q.  Did that concern you?
>
> A.  Sure, it did.
>
> Q.  Why?
>
> A.  Well, we had twelve to thirteen hundred people whose livelihood depended on working at that plant.
>
> Q.  So what was your mission? Did anybody explain to you what your mission was when they sent you to the plant?

A. The first monthly meeting that we had after I came to the plant was shortly after that. It was made very clear to me by Mr. Purdle in that meeting - - again, you know, we're ranking all the plants up there - -

MS. WALKER: Judge, we would object to hearsay.

MR. LACY: We don't offer it for the truth, just the fact there was a meeting where he was given - - he was given business instructions, Your Honor. I think it's also permissible to show what he was told he was supposed to do in his job.

THE COURT: Overruled.

Q. Go ahead, Mr. Hatley.

A. And, again, in this meeting, Gadsden was pretty well on the lower third on all the parameters you could look at.

MS. WALKER: Objection. It's nonresponsive, Your Honor.

THE COURT: Overruled.

Q. Go ahead, Mr. Hatley.

A. And I remember very distinctly in that meeting Mr. Purdle looking at me and saying, you know, Tom, you don't have long to get this turned around. So that was my mission was to get it turned around.

Q. That was in May, early May or late May?

A. The monthly meeting would have been in May, yes.

Q. Were you periodically reminded of the performance of the plant and the mission?

A. Yes, I was.

Q. Tell the jury some examples of those reminders.

A. Well, certainly Mark Waller, he was my complex manager. We would talk almost daily. But I worked quite a few Saturdays there at the plant. I had quite a bit going on.
   There were quite a few Saturdays where Mr. Lovett, who was then the senior vice-president of operations for Tyson, would call me at the plant, and, you know, remind me of what I had to get done and asked me how I was going to get it done, that I didn't have a lot of time to get it done.

-14-

*Trial Transcript, pp. 410-13.*

The plaintiffs also state that Hatley said that a college degree was needed, and point out that King did not have one. When asked whether a degree was absolutely required, Hatley testified that "[i]t was a criteria we looked at, a requirement we looked at, but it was not an absolute prerequisite, no." *Trial Transcript* at 438. Lola Hithon, the plaintiff's wife, testified that Hatley was under considerable pressure to improve the ratio of managers at the plant with college degrees but that a degree was not a requirement for promotion. John Hithon himself testified that there was pressure from above to get persons with college degrees, particularly from Mark Waller, the complex manager (manager of several plants).[6] Finally, King was already a shift manager at the Pine Bluff, Arkansas, plant, and, therefore, being awarded the same position at Gadsden would be considered a lateral move, not a promotion.

The plaintiffs even contend that the evidence was disputed as to whether the plant had been losing money. The evidence that the plant was losing money was clear. Even Hithon testified that he would rate the Gadsden plant very much below average for the past two years. In any event, it is without dispute that Hatley was sent to Gadsden for the very purpose of improving the plant's poor financial performance.

Hatley testified that he considered the negative comments about Hithon from John Pittard, a former Gadsden plant manager who had supervised Hithon for eight years. Pittard told Hatley that Hithon's performance was less than standard. Hatley further testified that "John's recommendation was that he would most definitely not recommend, at all, that John

---

[6] Hatley advised Hithon to take leadership classes and work on a college degree.

[Hithon] works hard, but that he couldn't grasp the whole picture." *Hatley Trial Testimony*, p. 445. In response, Hithon points to a 1990 letter written by Pittard, commending his job performance. Hatley, however, was not even aware of the five-year old letter's existence. On the other hand, Hatley testified that in addition to the fact that King was already working at a successful plant as a shift manager, King had very positive references from Tyson's executive vice-president of operations and senior vice-president of operations. Speaking of King, Hatley testified:

> And, again, the leading factor was that he was a shift manager already in a successful Tyson plant. In making phone calls to ask about Randy, I got recommendations from a number of people, including our executive vice-president of operations at the time, and the senior vice-president said, Tom, if you can get this young man, you need to do that.

*Trial Transcript*, p. 446. Hatley also received strong recommendations in favor of Dade. Waller highly recommended him, and the Senior Vice-President of Operations and the Executive Vice-President of Operations both recommended that Dade be given "a shot" as shift manager. *Trial Transcript*, p. 540. Hatley testified that these recommendations had "an awful lot to do with" selecting Dade. *Id.* at 454. Also, based on his observation of Dade's performance at the Gadsden facility, Hatley gave Dade exceptional praise for his work ethic and ability to motivate and lead people.

The plaintiffs state that the fact that Ash provided Dade some training in second processing is by itself reason enough to disbelieve Hatley's "proffered reason for the failure

-16-

to select Mr. Ash as shift manager."[7] The court disagrees. The fact that Dade received some training from Ash does not contradict the factors Hatley stated he considered, especially his desire to bring in new management and the emphasis he placed on recommendations.[8]

## Conclusion

It is concluded that the evidence of pretext is insufficient to support a finding that the reasons given by Hatley for making King and Dade shift managers were lies intended to cover-up racial discrimination against Hithon. It is further concluded, assuming that Ash told Hatley that he wanted to be interviewed and considered for shift manager, that the evidence is insufficient to find that Hatley's failure to consider Ash was the result of an intent to discriminate against him. Indeed, Hatley interviewed black managers whom he believed wanted to be considered. Also, Ash's qualifications were not a reason not to consider him, because Hatley could have selected Dade or King over Ash and a comparison of their respective qualifications would not have indicated discrimination. In short, there is an insufficiency of evidence to support a finding of intentional racial discrimination by Hatley against either Hithon or Ash.

Wherefore, Tyson's motion for judgment as a matter of law on Ash's and Hithon's discrimination claims is due to be granted, and those claims are due to be dismissed. A final

---

[7] As previously discussed, Hatley testified that he did not consider Ash because Ash said that he was not ready for the position.

[8] Any other assertion of discrimination not commented on is no more probative of discrimination than the assertions discussed.

Wherefore, Tyson's motion for judgment as a matter of law on Ash's and Hithon's discrimination claims is due to be granted, and those claims are due to be dismissed.[9] A final order in accordance with this memorandum of decision will be entered.

DONE this 26th day of March, 2004.

Robert R. Armstrong, Jr.
United States Magistrate Judge

---

[9] Dismissal, of course, will moot the jury's verdicts and the need for any further proceedings.